536 A.2d 137

**Nicholas Alexander McQUIGGAN, a Minor, etc.**

**v.**

**BOY SCOUTS OF AMERICA, et al.**

**No. 673, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Jan. 20, 1988.

706

John J. O'Neill, Jr., (Ford & O'Neill, Carole C. Perez and D'Erasmo, Shure & Perez, on the brief), Rockville, for appellant.

Wade J. Gallagher (Martell, Donnelly, Gallagher & Kastantin, on the brief), Rockville, for appellees, BSA and NCAC.

Allan A. Noble (Budow and Noble, P.C., on the brief), Bethesda, for appellees, William M. Hamm, Sr. and William M. Hamm, Jr.

Don F. Ryder, Jr. and Schroeder, Ryder, Braden, on the brief, Rockville, for appellee, Rush.

Thomas Patrick Ryan and McCarthy, Wilson & Ethridge, on the brief, Rockville, for appellee, Hestand.

Peter E. Derry, Pyne & Derry, Chevy Chase, for Edmund S. Copeland.

Argued before GILBERT, C.J., and MOYLAN and BLOOM, JJ.

GILBERT, Chief Judge.

The main question presented in this case is whether a twelve-year-old boy should be barred from recovery for an eye injury he sustained when he voluntarily participated in a paper clip shooting "game."

Nicholas Alexander McQuiggan, by and through his guardian, Jerome Keith Bradford, brought an action in tort against: the Boy Scouts of America (BSA); the National Capital Area Council for the Boy Scouts of America (NCAC); Thomas Hestand, Scoutmaster; William Hamm Sr., Edmund Copeland, and Keith D. Rush, Assistant Scout-

masters; and Billy Hamm and Kevin McDonnell, fellow Boy Scouts. Nicholas alleged that the scoutmasters are liable to him for their negligent supervision, and that the minor defendants, Billy [1] and Kevin, are liable for assault and battery. Nicholas further averred that BSA and NCAC are liable, under a doctrine of *respondeat superior*, for the negligence of the scoutmasters.

The trial was held in the Circuit Court for Montgomery County where, at the conclusion of Nicholas's case, the court granted a motion for judgment in favor of all the defendants. Aggrieved by the trial court's action, Nicholas has appealed to this Court.

The events giving rise to this litigation date from April 8, 1981, when sometime between 7:10 and 7:15 p.m. Nicholas was dropped off by his mother at the Epworth Methodist Church in Montgomery County to attend a Boy Scout meeting. The meeting was scheduled to start at 7:30 p.m. When Nicholas arrived, he noticed several of the other scouts engaged in a game in which they shot paper clips at each other from rubber bands they held in their hands. The paper clips were pulled apart on one end and squeezed closed on the other. At trial, Nicholas demonstrated how the clip was shot by placing the closed end of the clip in a rubber band stretched between two upright fingers in the form of a "v" and pulling back on the open end of the paper clip and releasing it. Nicholas testified that when he arrived at the church, two Assistant Scoutmasters, William H. Hamm Sr. and Keith D. Rush, were present in the meeting room. Another Assistant Scoutmaster, Edmund Copeland, arrived after Nicholas but before the meeting actually started.

Upon arriving at the meeting room, Nicholas sat at a table and began to read his Boy Scout Handbook. Between four and eight other scouts had been playing the paper clip shooting game and running in and out of the hallway

---

1. Billy was also included in the negligence count.

leading to the meeting room for about ten minutes before Nicholas decided to join them. Prior to his joining the game, no one had shot paper clips at him. When one of the boys asked Nicholas to join in the game, he did so freely, feeling no pressure to participate. Nicholas further related that he knew that the object of the game was to shoot paper clips; he knew that paper clips would be shot at him; he knew that there was a chance he would be hit with a paper clip.

When he decided to join in the game, Nicholas looked through some material on a shelf, and he located an elastic hair band with which he intended "to chase" the other boys. Nicholas and an unidentified Boy Scout then chased Billy Hamm Jr. and Kevin McDonnell up the hallway. Nicholas said he had no paper clips, but the boy with him was shooting them. Nicholas admitted at trial that his actions were such as to lead Kevin or Billy to believe that he had a paper clip in his possession. Nicholas further narrated that he was actively "participating" in the game.

After Nicholas had chased Billy and Kevin down the hallway for about ten feet, the two boys turned around and chased Nicholas back down the hall. Nicholas said that he dropped the hair band and entered the meeting room. He then stopped running, "split apart" from the unidentified boy, and started to walk toward a table. He told the court that at that point he "stopped playing," but he did not communicate that fact in any way to the other boys. Approximately five seconds later and five feet into the meeting room, Nicholas felt something in his right eye. When he brushed the eye, a paper clip dropped to the floor. According to Nicholas, his entire involvement in the game consumed approximately thirty seconds.

### Assumption of the Risk

"A plaintiff is said to have assumed the risk of injury when, with full knowledge and understanding of an obvious danger, he/she exposes himself or herself to that particular danger, thus voluntarily abandoning his/her right to com-

plain." Gilbert, *Maryland Tort Law Handbook* § 11.6; *Hooper v. Mougin,* 263 Md. 630, 284 A.2d 236 (1971).

■ Assumption of the risk negates the issue of a defendant's negligence by virtue of a plaintiff's previous abandonment of his or her right to maintain an action if an accident occurs. *Pfaff v. Yacht Basin Co.,* 58 Md.App. 348, 473 A.2d 479 (1984); *see also* Gilbert, *supra.*

The Maryland Courts have identified three elements to be established before a risk is deemed legally assumed. The defendant must show that the plaintiff (1) had knowledge of the risk of danger, (2) appreciated that risk, and (3) voluntarily exposed himself to it. *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 630, 495 A.2d 838 (1985); *Gibson v. Beaver & Southern States Howard County Petroleum Coop., Inc.,* 245 Md. 418, 421, 226 A.2d 273 (1967).

■ Whenever a case is taken from the jury by way of a motion for judgment, as with its predecessor the erstwhile directed verdict, we are required to view the evidence in the light most favorable to the party against whom the motion is made. *Impala Platinum, Ltd. v. Impala Sales (USA),* 283 Md. 296, 389 A.2d 887 (1978); *Smith v. Miller,* 71 Md.App. 273, 525 A.2d 245 (1987); *Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 507 A.2d 203 (1986). The undisputed evidence in appellant's own case demonstrated that defendants have met that threefold burden. First, Nicholas had observed the other boys shooting paper clips at each other for about ten minutes before he joined in, and he knew that the object of the game was to hit another with the paper clips that were shot from the rubber band. Furthermore, he testified that no paper clips were shot at him before his involvement in the game, and he knew that by participating paper clips would be shot at him. Second, he twice admitted during his testimony that he knew there was a "chance" he could be hit someplace on or about his person while playing the game or that somebody might strike him with a paper clip. Third, he admitted that he joined the game freely. There was no evidence at all that

Nicholas did not understand, appreciate, or voluntarily expose himself to the risk he encountered.

Nicholas argues, nevertheless, that he did not know or anticipate that a paper clip might enter his eye. The answer to that contention is found in *Gibson v. Beaver, supra.* There the Court said:

"In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him." 245 Md. at 421, 226 A.2d 273.

Although by entering into the game, Nicholas did not assume *all* risks, *Hooper v. Mougin, supra,* 263 Md. at 638, 284 A.2d 236, being shot in the eye was not an "unusual" danger or one that a child his age could not comprehend, understand or appreciate. *See Taylor v. Armiger,* 277 Md. 638, 650, 358 A.2d 883 (1976). In *Nesbitt v. Bethesda Country Club, Inc.,* 20 Md.App. 226, 632, 314 A.2d 738 (1974), this Court quoted from 4 Am.Jur.2d., § 98, where it is stated: "A voluntary participant in any lawful game, sport or contest, in legal contemplation by the fact of his participation, assumes all risks incidental to the game, sport or contest which are obvious and foreseeable." Even though Nicholas was only twelve years of age at the time of the incident, there is no doubt that a child of that age can assume the risk of his or her actions. *Casper v. Chas. F. Smith & Son,* 71 Md.App. 445, 473, 526 A.2d 87 (1987); *Kirby v. Hylton,* 51 Md.App. 365, 378, 443 A.2d 640 (1982).

Assuming, as we must, the truth of all of Nicholas's credible evidence and all inferences reasonably deducible therefrom, *Impala, supra,* we believe that reasonable minds could not differ in concluding that Nicholas appreciated the obvious dangers attendant to his playing in a paper clip shooting game, and that he assumed the risk and consequences of his involvement. *See Kirby,* 51 Md.App. at 379, 443 A.2d 640. When, as here, the facts permit only one valid conclusion, assumption of the risk may be found as a matter of law. *Hooper,* 263 Md. at 635, 284 A.2d 236;

*Gibson v. Beaver,* 245 Md. at 422, 226 A.2d 273; *Casper,* 71 Md.App. at 473, 526 A.2d 87.

Nicholas further asseverates that, even assuming that he had initially assumed the risk of injury, a jury could have found that he did not assume the risk of the injury he sustained *after* he had stopped playing. By terminating his involvement, Nicholas says, he ceased assuming the risk.

■ The record reveals that Nicholas's total involvement in the game lasted approximately thirty seconds. He was, as we have seen, shot in the eye within five seconds of his having made a subjective determination to stop playing. The simple fact that he dropped his elastic band as soon as the "hunted" became the "hunters" and he stopped running once he was five feet into the meeting room was not a sufficient manifestation of his intent to the other boys in the game. By failing to notify the players that he was no longer in the contest, Nicholas assumed the risk that the other boys would believe him to still be a willing, active participant. For a jury to find that Nicholas had, in five seconds, by his passive actions and mental processes, successfully and overtly terminated his involvement would require sheer conjecture and speculation on the part of the fact finder.

### Contributory Negligence

■ Alternatively, the trial judge could have found that, by failing to notify the other players of his decision to stop participating in the game, Nicholas further compounded his original negligence. By voluntarily chasing the boys when he had already observed the nature of the game, Nicholas not only assumed the risk of injury but was negligent from the very start. Through his involvement, Nicholas, from the beginning, *did* "something which directly contributed to the injury sustained." *Scott v. John H. Hampshire, Inc.,* 246 Md. 171, 175, 227 A.2d 751 (1967). When he later failed to externalize in some fashion his subjective intent to terminate the game, he simultaneously *failed* to do "something"

which would have prevented the injury.[2] *Id.* He cannot now be heard to exclaim that the defendants had a duty to stop the game, when he, himself, neglected to call a halt to it. "[I]t is a fundamental principle of negligence that a person must use his Providence-given senses to avoid injury to himself. This [tenet] has been recognized since time immemorial." *So. Md. Electric v. Blanchard,* 239 Md. 481, 485, 212 A.2d 301 (1965); *see also Snider v. Senneville,* 267 Md. 552, 557, 298 A.2d 175 (1973). Nicholas's participation in the game and his failure to make known to others his termination of that participation are prominent decisive acts which directly contributed to the injury. *Kirby,* 51 Md.App. at 378, 443 A.2d 640. The trial judge could have found Nicholas guilty of contributory negligence as a matter of law. *See e.g. Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221, 403 A.2d 1221 (1979).

## Last Clear Chance

▮ Appellant's argument that defendants scoutmasters had the last clear chance to avert the injury is unavailing. "Knowledge on the part of the person who causes the injury which is superior to that of the person who is injured is the basis of the doctrine of last clear chance." Gilbert, § 11.5.1 at 98. In the case *sub judice* there was no evidence that the scoutmasters knew of the boys' shooting of paper clips. The meeting room was forty to fifty feet wide and eighty to ninety feet long. When Nicholas arrived, the scoutmasters were apparently setting up the meeting at the far end of the room. There is nothing in the record to indicate that the game was taking place anywhere near them.

Nicholas, on the other hand, knew that the game was being played, understood the nature of it, and, yet, know-

---

**2.** Nicholas's argument is another version of one child's striking another and then calling "time" before a return blow can be struck. Nicholas seeks to be "saved by the bell." The difficulty is that he was the only one who heard it ring, because it rang in his mind and was not audible to the other players.

ingly participated. He could have alerted the scoutmasters, or, as we stated, he could have avoided the injury by announcing to the others that his participation was ended.

"If the defendant does not discover the plaintiff's situation, but merely might do so by proper vigilance, it is obvious that neither party can be said to have a 'last clear' chance. The plaintiff is still in a position to escape, and his lack of attention continues up to the point of the accident, without the interval of superior opportunity of the defendant, which has been considered so important. The plaintiff may not reasonably demand of the defendant greater care for his own protection than that which he exercises himself. Accordingly, the nearly universal rule is that there can be no recovery."

*Prosser & Keeton on The Law of Torts*, § 66 at 467.

### Consent to Battery

■ The trial judge also found that Nicholas could not prevail on his assault and battery counts because by his actions "not only in participating in the game but pursuing ... Billy Hamm [and Kevin McDonnell] down the hallway ... as a matter of law he consented to the infliction of the injury upon him." We agree.

■ A battery consists of the unpermitted application of traumaby one person upon the body of another person. Gilbert, § 3.1; *Ghassemieh v. Schafer*, 52 Md.App. 31, 447 A.2d 84, *cert. denied*, 294 Md. 543 (1982). The gist of the action is not hostile intent but the absence of consent to the contact on plaintiff's part. *Ghassemieh*, 52 Md.App. at 38, 447 A.2d 84. When a plaintiff "manifests a willingness that the defendant engage in conduct and the defendant acts in response to such a manifestation," Prosser, § 18 at 113, "his consent negatives the wrongful element of the defendant's act, and prevents the existence of a tort." *Id.* at 112.

The circumstances leading to Nicholas's injury do not constitute an assault and battery. As stated in Prosser, § 18 at 114:

"One who enters into a sport, game or contest may be taken to consent to physical contacts consistent with the understood rules of the game. *It is only when notice is given that all such conduct will no longer be tolerated that the defendant is no longer free to assume consent.*" (Emphasis supplied.)

Nicholas's willful joining in the game, without any notice of his withdrawal from participation, bars recovery from either Billy or Kevin.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.