699 A.2d 550

Gloria PETTIT, Individually, etc.

v.

ERIE INSURANCE EXCHANGE.

No. 1761, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Sept. 5, 1997.

214

Steven M. Nemeroff (Wortman & Nemeroff, P.A., on the brief), College Park, for Appellants.

Charles E. Wilson, Jr. (McCarthy, Wilson & Ethridge, on the brief), Rockville, for Appellee.

Argued before WENNER, EYLER and SONNER, JJ.

EYLER, Judge.

This case involves the question of whether, for purposes of determining the applicability of an intentional injury exclusion in various homeowner's liability policies, an insured's intent to injure is presumed as a matter of law from his sexual molestation of two minor boys or whether the question of intent is an issue of fact that may not be resolved on summary judgment. While we have had occasion to consider a similar issue previously in the case of *Harpy v. Nationwide Mut. Fire Ins. Co.*, 76 Md.App. 474, 545 A.2d 718 (1988), appellants seek to distinguish *Harpy* primarily on the basis that, in this case, there is expert testimony that the insured suffers from "pedophilia," a mental disorder, and consequently, that he did not intend to harm his victims. Consistent with *Harpy*, we hold that the insured's intent to molest two young boys sexually is sufficient to trigger the intentional injury exclusion of the policies at issue. Accordingly, we shall affirm the judgment of the circuit court.

## Facts

Gloria Pettit, as mother and next friend of her two minor children, appellants, filed an action against James Kowalski in the Circuit Court for Prince George's County for injuries sustained by appellants as a result of Kowalski's sexual molestation of the children. The amended complaint alleges that, beginning on or about April 1, 1991, Kowalski befriended the boys' father, Roger Deprey. Approximately one year later, Mr. Deprey died of a brain tumor. The amended complaint further alleges in pertinent part that, between April 1, 1991 and May 25, 1993, (1) Kowalski used his relationship with Roger Deprey and the subsequent death of Roger Deprey to befriend the minor plaintiffs, and to gain the plaintiffs' interest, affection, loyalty, and trust; and (2) as a result of this special relationship and in light of the recent death of their father, Kowalski became very attentive to the minor plaintiffs' needs, providing, at times, care and supervision of the minor plaintiffs, and assuming a fatherly role towards the children. The amended complaint goes on to allege that, unknown to the minor plaintiffs' parents, "Kowalski was a pedophile who, for many years, had had recurrent sexual fantasies and sexual urges with numerous other prepubescent children." It further alleges that, during the relevant time period, Kowalski used his relationship with the minor plaintiffs to act on his pedophilic urges and fantasies as follows:

[Kowalski] committ[ed] fellatio and oral sex with the minor Plaintiffs with injury; undressed the minor Plaintiffs; physically masturbat[ed] the minor Plaintiffs; fondl[ed] the minor Plaintiffs; and filmed these pedophilic activities, all of which was for the purpose of [Kowalski's] self gratification and satisfaction of [Kowalski's] sexual fantasies as a pedophile[; and]

* * * *

[While the children were in his custody, Kowalski] allowed, permitted and encouraged others ... to perform similar pedophilic acts on the [minor Plaintiffs], while in the pres-

ence of [Kowalski], for the self gratification and satisfaction of [Kowalski's] sexual fantasies.

While the amended complaint is silent on the issue, the record reveals that the minor appellants were ages seven and nine at the time the sexual abuse first began. After setting forth the factual allegations, the amended complaint then purports to state a cause of action based on various negligence theories. On appeal, appellants specifically identify three negligence theories: (1) negligent care and supervision of the minor children; (2) failure to warn of a dangerous mental condition (pedophilia) and/or failure to refrain from harmful conduct; and (3) failure to take reasonable steps to make his premises safe (i.e., premises liability).

During all or some portion of the relevant time period, Kowalski was insured under three different types of liability insurance policies issued by Erie. For the entire time period, Kowalski was covered by a HomeProtector 2003 Policy.[1] This policy contains a broad coverage clause that covers all sums the insured becomes legally obligated to pay because of bodily injury or property damage covered by the policy. The policy excludes "[b]odily injury or property damage expected or intended by anyone we protect." For the time period from May 1993 through May 1994, essentially for the last month the abuse allegedly occurred, Kowalski was covered by an Ultrasure Package Policy for Landlords and a HomeProtector 2004 Tenantcover Edition Policy. These latter two policies limit coverage to personal injury and property damage caused by an occurrence and define occurrence as "an accident, including continuous or repeated exposure to the same general harmful conditions." These policies exclude "injury or damage expected or intended from the standpoint of the insured." In addition, the Tenantcover Policy contains a clause excluding "bodily injury or property damage which arises out of the sexual molestation, corporal punishment or physical or mental abuse by anyone we protect." While appellants acknowledge

---

1. Two such policies were issued covering the time period from April 1990 through July 1992 and from July 1992 through July 1993, respectively.

that the sexual molestation exclusion, if applicable in the instant case, would exclude coverage, Erie informs us that this particular exclusion was not approved by the Maryland Insurance Commissioner until 1995, and thus, Erie concedes that it has no application to the instant case.

On November 9, 1994, Erie filed a declaratory judgment action claiming that it owes no defense or coverage under any of the policies for Kowalski's acts. By stipulation, the parties agreed to stay the underlying tort action until resolution of the declaratory judgment action. The parties filed cross-motions for summary judgment. In opposition to Erie's motion for summary judgment, appellants submitted (1) an affidavit of James Kowalski wherein Kowalski stated that he neither expected nor intended to injure the minor appellants; (2) portions of the transcript of Kowalski's criminal trial containing testimony of Fred Berlin, M.D., Michael Sweda, Ph.D., and Joanna Brandt, M.D., including their conclusions that Kowalski is a pedophile; and (3) an affidavit of Neil H. Blumberg, M.D. who, upon review of Kowalski's medical records and the trial testimony of Drs. Berlin, Sweda, and Brandt, concluded that (a) Kowalski suffers from a mental disorder known as pedophilia, (b) pedophilia is not characterized by intent to injure or harm the sexual partner, and (c) based on the fact that Kowalski is a pedophile, it is Blumberg's opinion to a reasonable degree of medical probability that Kowalski did not have the intent to harm the minor appellants.

Following a hearing, the circuit court concluded that the policies provide no coverage as a matter of law, and granted Erie's motion for summary judgment and denied appellants' motion for summary judgment. This appeal followed.

## Questions Presented

Appellants present three questions on appeal that really are restatements of but a single issue:

Did the circuit court err by concluding, as a matter of law, that the allegations in the amended complaint do not give rise to a "potentiality of coverage" under any of the insurance policies?

■■■■■■■■■■

### Standard of Review

■ Under Rule 2–501(a), a party may file a motion for summary judgment "on the ground that there is no genuine dispute as to material fact and that the party is entitled to judgment as a matter of law. . . ." Subsection (e) of the rule directs the trial court to grant summary judgment in favor of the movant "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Under the summary judgment rule, a trial court does not resolve disputed issues of fact, but instead, makes rulings as a matter of law. *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993); *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005 (1993). Thus, the standard for appellate review of a grant of summary judgment is whether the trial court was legally correct. *Griffith,* 332 Md. at 712, 633 A.2d 84; *Beatty,* 330 Md. at 737, 625 A.2d 1005.

■ In reviewing the trial court's grant of summary judgment and declaratory relief, we further are mindful of the principles governing declaratory judgment actions involving insurance coverage disputes. Generally, declaratory judgment actions, brought in advance of the underlying tort actions, are not a favored means of resolving liability insurance coverage disputes. *Allstate Ins. Co. v. Atwood,* 319 Md. 247, 255, 572 A.2d 154 (1990).

> "A declaratory judgment action prior to the trial of a tort action against the insured may under certain circumstances be a valuable means of resolving questions of policy coverage where those questions are independent and separable from the claims asserted in a pending suit by an injured third party.
>
> \* \* \* \*
>
> But where . . . the question to be resolved in the declaratory judgment action will be decided in [a] pending action[ ], it is inappropriate to grant a declaratory judgment."

*Chantel Associates v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 147, 656 A.2d 779 (1995) (quoting *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 405–06, 347 A.2d 842 (1975)).

When an insurance company claims lack of coverage due to an issue entirely collateral to the underlying tort action, such as the insured's failure to comply with some condition of the policy, a declaratory judgment action ordinarily is appropriate. *Brohawn*, 276 Md. at 405, 347 A.2d 842. Similarly, when there is no potentiality of coverage as a matter of law, or if coverage turns upon an issue "independent and separable from the claims asserted," a declaratory judgment action is appropriate. *See American Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 593–94, 659 A.2d 1295 (1995) (when allegations of complaint could not be read to assert that pollution was "sudden and accidental," there was no potentiality of coverage, no basis upon which the insurer could be held liable to indemnify any judgment rendered against the insured, and declaratory judgment in advance of the tort trial was appropriate); *Chantel Associates*, 338 Md. at 147–49, 656 A.2d 779 (where issue of coverage was dependent upon when plaintiff's lead-related injuries first occurred, and such issue was "independent and separable from the claims asserted," a pre-trial declaratory judgment action to determine insurer's duty to indemnify was proper).

The parties are in agreement that declaratory judgment is the appropriate means for resolving the coverage issue in this case. They are correct. The parties agree that Kowalski intended to molest the minor appellants sexually; they disagree that that intent is sufficient to trigger the intentional injury exclusion. If appellants are correct that the issue of coverage turns on Kowalski's subjective beliefs regarding the normalcy and healthiness of sexual relations between an adult and a child,[2] that is an issue that appellants

---

**2.** Kowalski's affidavit states that he "was a member of NAMBLA (National Association of Man–Boy Lovers) which is a national organization, comprised of tens of thousands of educated, adult men, who hold responsible positions in our community and who advocate and promote

need not litigate in the underlying tort action, and declaratory judgment in advance of trial is proper. Similarly, if Erie is correct that the issue of coverage may be determined as a matter of law, declaratory judgment in advance of trial is proper.

## Discussion

Appellants argue that coverage potentially exists because they have asserted claims of negligence rather than claims based on intentional tort. As we stated earlier, appellants identify at least three negligence theories under which they proceed: (1) failure to warn or refrain from harmful conduct; (2) negligent care and supervision; and (3) premises liability. Preliminarily, we fail to see how Mr. Kowalski's pedophilia constitutes a premises defect that would support a cause of action for premises liability. Further, appellants have not cited, and our research has not uncovered, any case holding that there is a duty in negligence to warn others that one is about to commit an intentional tort.[3] With respect to appel-

---

adult sexual behavior with male children as normal, healthy, and satisfying relationships. This organization also believes that such behavior is not in any way injurious to children." Further, Dr. Berlin testified at the criminal trial that, even in the face of serious charges, Kowalski continued to maintain that there was nothing wrong or harmful about his behavior.

3. Appellants rely principally upon *B.N. v. K.K.*, 312 Md. 135, 538 A.2d 1175 (1988), and *Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993), in support of their argument that a duty to warn exists in this case. Neither of those cases, however, involved a duty to warn paired with an intentional tort. In *B.N.*, had the defendant warned the plaintiff that he had genital herpes, he would have discharged any duty owed to her. If the parties had thereafter engaged in consensual sex, no tort would have occurred. Similarly, had the defendant in *Faya* warned his patients that he was HIV positive, he would have discharged any duty owed to them, and with his patients' consent, could subsequently have performed their surgeries without the imposition of tort liability. In the instant case, Kowalski could not have avoided tort liability simply by warning the Pettits that he was a pedophile. Any such warning would not have insulated him from liability for subsequently molesting the children. Appellants suggest that if Kowalski had warned Ms. Pettit and Mr. Deprey that he was a pedophile, and had continued to have access to the children, there might be an issue of contributory negli-

lants' claims for negligent care and supervision, we note that it was Kowalski's intentional sexual molestation of the children and intentional self gratification by permitting others to molest the children, and not any other aspect of his care and supervision of the children, that caused their injuries. Accordingly, such a claim could be viewed as "a patent attempt to recharacterize, as negligent, an act that is clearly intentional. . . ." *Atwood,* 319 Md. at 253, 572 A.2d 154. In any event, even if we assume that Kowalski breached some duty in negligence to appellants, that does not change the fact that it was his ultimate sexual molestation of the boys that resulted in the injuries for which they seek compensation. Thus, we agree with Erie that any concurrent breach of negligence duty does not change the inquiry of whether Kowalski intended or expected to injure the children at the time he molested them.

■ Appellants argue that the trial court created an irrebutable presumption that intent to injure is inferred whenever an adult engages in sexual conduct with a child, and that such a presumption is contrary both to the terms of the policies and to Maryland law. With regard to the policies, appellants point to the fact that one of the policies contains a sexual molestation exclusion. Appellants argue that the fact that such an exclusion could have been used by Erie, but was included in only one of the policies, demonstrates that sexual molestation is not excluded under the other policies at issue. Although it is true that the issue of coverage would be more straightforward were we faced simply with a sexual molestation exclusion, the fact that such an exclusion was not used in the policies does not mean that sexual molestation is covered. Indeed, liability insurance policies often contain both broad exclusions and specific exclusions that overlap.

■ With respect to their assertions regarding Maryland law, appellants, relying upon *Aetna Cas. & Sur. Co. v. Cochran,* 337 Md. 98, 651 A.2d 859 (1995), and *Allstate Insurance*

gence. We do not see, however, how the parents' negligence could affect the separate claims of the children.

*Co. v. Sparks,* 63 Md.App. 738, 493 A.2d 1110 (1985), argue that Maryland law requires the application of a subjective test to determine whether bodily injury is intended or expected by the insured for the purpose of applying the intentional injury exclusion. More particularly, appellants argue that in order for the exclusion to apply, Erie must demonstrate that Kowalski formed the specific intent to cause the injuries sustained by the Pettit children. Appellants argue that the evidence demonstrates that Kowalski did not intend or expect to injure the Pettit children when he engaged in his sexual abuse of them. In support of that assertion, appellants point to the fact that the molestation did not involve forcible rape or violence, and that Kowalski's nonsexual conduct toward the children (e.g., helping them with their homework, taking them shopping, swimming, to sporting events, and on camping and field trips, picnics and outings), including naming the children as beneficiaries in his will, demonstrate that he loved the children. Appellants further point to Kowalski's affidavit wherein he states that he neither expected nor intended to injure the children, to the expert opinions classifying Kowalski as a pedophile, and to the expert opinions that pedophiles often believe their sexual relationships with children to be normal and healthy expressions of love.

Contrary to appellants' assertion, *Cochran* does not even address the issue of the type of intent required to trigger an intentional injury exclusion. Appellants are correct, however, that *Sparks* addresses the issue. In *Sparks,* the insured, with two friends, attempted to steal gasoline from a feed truck by siphoning. While the youths were siphoning the gasoline, the insured decided to provide illumination with a cigarette lighter. Gas fumes in the area of the truck ignited and a nearby mill and substantially all of its contents were destroyed in the resulting fire. The parties agreed that the boys intended to steal gas but did not intend to burn the property.

The insurer argued that coverage was excluded under the policy's intentional damage exclusion. Focusing on the fact that the exclusionary clause excluded coverage for "damage which is either expected or intended *from the standpoint of*

*the Insured,"* this Court held that such language required application of "a more subjective standard of intent than the test of foreseeability" urged by the insurer. Quoting 7A Appleman, *Insurance Law and Practice,* § 4492.02 (1979), we further stated:

> The word "intent" for purposes of tort law and for purposes of exclusionary clauses in insurance policies denotes that the actor desires to cause the consequences of his act or believes that consequences are substantially certain to result from it. In order for an act to be intentional, its consequences must be substantially certain to result as opposed to the feature of wanton acts that the consequences be only probably certain to result. . . .

*Id.* at 743–44, 493 A.2d 1110. *See also Harpy,* 76 Md.App. at 483, 545 A.2d 718. Applying such a test, we upheld the trial court's finding that the insurer could be liable under the policy. Accordingly, at least when the "from the standpoint of the insured" language appears within the exclusionary clause, *Sparks* requires application of a subjective standard.

Even if we assume that application of a subjective standard is appropriate in this case,[4] application of such a standard does not necessarily transform the issue of Kowalski's intent into a fact issue. First, *Sparks* is factually distinguishable from the case before us. By igniting a cigarette lighter, the insured in *Sparks* neither expected nor intended to start a fire that ultimately resulted in the property damage. In this case, it is undisputed that Kowalski intended to perform sexual acts on the boys for his own sexual gratification when he molested them. While the ignition of gasoline fumes in *Sparks* was neither intended nor expected, the sexual contact in this case was both intended and expected. Second, there are certain intentional acts which necessarily embody an intent to harm.

---

4. The HomeProtector 2003 policies, which cover all of the relevant time period, do not contain the *"from the standpoint of the insured"* language; only the Ultrasure and Tenantcover policies, which cover only the last month of abuse, contain such language.

We believe that the circuit court was correct in equating intent to sexually molest with intent to injure. By definition, Kowalski's sexual molestation of the boys constituted common law battery. *See Doe v. Archdiocese of Washington,* 114 Md.App. 169, 186, 689 A.2d 634 (1997) (holding that compensable harm occurs at time of child sexual abuse regardless of whether the victim is aware that the act is wrong or of the full extent of the harm). Under the definition provided in the Restatement (Second) of Torts,

[a]n actor is subject to liability to another for battery if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) a harmful contact with the person of the other directly or indirectly results.

Restatement (Second) of Torts § 13 (1965). If the act is done with the intention of making the offensive contact, it is immaterial that the actor is not motivated by any personal hostility or intent to injure. § 13, comment c; § 16, comment b. Further, what constitutes offensive contact is defined by a community standard. *See* § 19 ("A bodily contact is offensive if it offends a reasonable sense of personal dignity."). *See also* § 19, comment a (in order to be considered offensive, the contact "must be one which would offend the ordinary person.... It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted.").

Sexual contact by an adult upon a minor child clearly falls within our society's definition of offensive and harmful contact. Indeed, under Maryland law, an adult is guilty of a second degree sexual offense if he or she engages in a sexual act with a person who is under fourteen years of age, Md.Code Ann., Art. 27, § 464A (1996 Repl.Vol.), and guilty of a third degree sexual offense if he or she engages in sexual contact with a person who is under fourteen years of age. Art. 27, § 464B. In addition, although consent is a defense to battery, consent to sexual contact with an adult cannot be given by a

child as a matter of law. To be effective, consent must be given by one who has the capacity to give it. Restatement (Second) of Torts § 892A, comment b. Further, while a child's consent may be effective in certain instances, *see McQuiggan v. Boy Scouts of America,* 73 Md.App. 705, 714, 536 A.2d 137 (1988), it is only effective if the child is "capable of appreciating the nature, extent and probable consequences of the conduct consented to." Restatement (Second) of Torts § 892A, comment b. We have no trouble in holding as a matter of law that seven and nine year old children are incapable of appreciating the nature, extent and probable consequences of sexual conduct with an adult, and thus, cannot provide valid consent. Moreover, comment b goes on to indicate that, even when a person is in fact competent to give consent, a statute may prevent the consent from being effective if the statute is found to be intended to give special protection against certain kinds of harm. One example given by comment b is statutory rape.

■ As the Court of Appeals noted in *Bailer v. Erie Ins. Exchange,* 344 Md. 515, 534, 687 A.2d 1375 (1997), for purposes of the intentional injury exclusion, there are some tortious acts that are indistinguishable from the tort victim's harm. In *Bailer,* the Court held that intrusion upon seclusion was one such tort. *Id.* "The insured's conduct, the invasion, and the claimant's harm, the invasion, are one and the same." *Id.* Similarly, Kowalski's conduct, the sexual molestation, and appellants' harm, the sexual molestation, are one and the same.[5] Accordingly, we hold that as long as Kowalski formed the intent to molest the boys sexually, a matter that is undisputed, he formed the intent to injure them as a matter of law. He need not have expected or intended that injury would

---

5. In *Bailer,* the Court's determination resulted in a finding of coverage under the theory that the intentional injury exclusion nullified the clause of the policy that expressly provided coverage for invasion of privacy. The Court held that such a nullification resulted in an ambiguity that had to be construed against the insurer. We have no such conflict between the covering clause and the exclusionary clause in this case.

manifest in any particular manner. Our holding in this case is consistent with prior Maryland cases and with cases from the vast majority of other jurisdictions that have considered the question.

In *Atwood*, the Court of Appeals addressed the question of whether an insurer could relitigate the issue of negligence in a post-tort trial declaratory judgment action. 319 Md. at 247, 572 A.2d 154. In setting forth the operative principles, however, the Court noted that "[w]here the allegations in the tort suit against the insured obviously constitute a patent attempt to recharacterize, as negligent, an act that is clearly intentional, we believe that a declaratory judgment action prior to the trial of the tort case is permissible." *Id.* at 253, 572 A.2d 154. The Court then discussed favorably a case from the Supreme Court of Colorado, *Troelstrup v. District Court*, 712 P.2d 1010 (Colo.1986), that is directly on point. In *Troelstrup*, the underlying tort action was an action by a minor against the insured for engaging in homosexual acts and committing a sexual assault upon the minor. It further was alleged that the insured photographed and developed nude and erotic photographs of the minor. The *Atwood* Court noted that Colorado, similar to Maryland, generally prohibits the use of pre-tort trial declaratory judgments to resolve coverage disputes. *Id.* The Court then noted that the *Troelstrup* court "held that in situations where 'the nature and character of the act is such that the intent to inflict injury may be inferred as a matter of law,' a declaratory judgment action before the tort trial is appropriate." [6] *Atwood*, 319 Md. at 253–54, 572 A.2d 154. The Court went on to "agree with the Supreme Court of Colorado that, when an intent to injure may be inferred as a matter of law, a pre-tort trial declaratory judgment action may be an appropriate proceeding in which to resolve the coverage issue." *Id.* at 254, 572 A.2d 154. Further, as examples of cases wherein an intent to injure may be inferred

---

**6.** After remand, and upon a second appeal, the Supreme Court of Colorado reaffirmed its holding in *Allstate Ins. Co. v. Troelstrup*, 789 P.2d 415 (Colo.1990).

as a matter of law, the Court cited to a number of cases involving " 'negligent' sexual assault," including *Allstate Ins. Co. v. Kim W.*, 160 Cal.App.3d 326, 331–32, 206 Cal.Rptr. 609 (1984), a case on which Erie now relies. While the Court's discussion of inferred intent in *Atwood* did not constitute a direct holding, the Court clearly signaled a willingness to hold that intent to injure may be inferred in certain cases, and that cases involving sexual molestation are one such type of case.

Our holding in this case similarly is consistent with our holding in *Harpy, supra.* In *Harpy*, we held that the insured's intent to injure his minor daughter by sexually molesting her was not an issue that would be decided in the underlying tort action, but instead, intent to injure could be presumed as a matter of law. Accordingly, we upheld summary judgment in favor of the insurer in a pre-tort trial declaratory judgment action. Similar to this case, we held that sexual abuse is excluded under the intentional injury exclusion regardless of whether an objective or subjective test is applied. 76 Md.App. at 482–84, 545 A.2d 718. We similarly distinguished *Sparks* on the basis that while there is no substantial certainty that one stealing gasoline will start a fire, there is substantial certainty that sexual molestation of a child by her father over an extended period of time will cause that child to suffer serious harm. *Id.* at 483, 545 A.2d 718. We further noted:

> While it is true that an intended act causing unintentional injury, under some circumstances, can be considered negligence, [a]s the probability of injury to another, apparent from the facts within his knowledge, becomes greater, his conduct takes on more of the attributes of intent, until it reaches the substantial certainty of harm which juries, and sometimes courts, may find inseparable from intent itself.

*Id.* at 483–84, 545 A.2d 718 (quoting *Ghassemieh v. Schafer*, 52 Md.App. 31, 41, 447 A.2d 84, *cert. denied*, 294 Md. 543 (1982)) (quoting Prosser, *Law of Torts* § 31 (4th Ed.1971)). We held in *Harpy*, and reaffirm in this case, that sexual conduct between an adult and a child is so substantially certain to

result in harm to the child that injury is intentional as a matter of law.

██ Appellants distinguish *Harpy* primarily on the basis that in this case, Kowalski was diagnosed a pedophile, and such a diagnosis vitiated his intent. Appellants do not offer a definition of pedophile for our review. We will, however, take judicial notice of the definition of pedophile provided in Diagnostic Statistical Manual IV (DSM–IV), a publication of the American Psychiatric Association. *See Faya*, 329 Md. at 444, 620 A.2d 327 (quoting Murphy, *Maryland Evidence Handbook*, § 1000(A)(2))(to place allegations of complaint in context, courts may take judicial notice of additional facts that are "capable of immediate and certain verification by resort to sources whose accuracy is beyond dispute"). The DSM–IV defines pedophile as follows:

**302.2  Pedophilia**

A.  Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

B.  The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

C.  The person is at least 16 years and at least 5 years older than the child or children in Criterion A.

Under this definition, one may be classified a pedophile solely as a result of one's behavior. The definition is not dependent upon any particular set of beliefs or upon any distortion in cognition or perception. Under this definition, the insured in *Harpy* would be considered a pedophile, as it was alleged that he sexually abused his daughter in various ways, during the years 1979 through 1984, when the child was between the ages of nine and thirteen. Thus, the mere diagnosis of pedophile adds nothing to this case.

In addition to the diagnosis of pedophile, we have in this case the opinions of Drs. Berlin and Blumberg that pedophiles often believe their sexual relations with children to be normal

and healthy and not harmful, and Kowalski's statements that he believes sexual conduct between adult men and male children is normal, healthy, and not in any way injurious. There is no evidence that Kowalski's sexual contact with the boys was the result of an involuntary reflex. Nor is there any indication that Kowalski, due to his "mental disorder," mistakenly believed he was engaging in sexual activity with consenting adults at the time he was engaging in such conduct with the boys. In short, the record disputably establishes that Kowalski voluntarily engaged in sexual activities with the boys, and that he possesses a subjective belief that such activities are neither harmful nor injurious. Further, the record establishes that Kowalski knew that others, and particularly the boys' parents, would not agree with his subjective beliefs.[7]

Appellants seek to distinguish *Harpy* on a number of other bases that are unpersuasive. Contrary to appellants' assertion, *Harpy* is not distinguishable on the basis that it involved "violent unconsensual (sic) rape." In *Harpy* we merely noted that the sexual abuse included sexual intercourse, and mentioned nothing regarding violence or forcible rape. The minor appellants in this case were no better able to consent to various sexual acts with Kowalski than was the child in *Harpy*. As we stated earlier, as a matter of law, these children cannot consent to sexual acts with an adult. As a matter of law, any sexual contact between an adult and a child, whether or not accompanied by force, is injurious to the child.

Appellants next seek to distinguish *Harpy* on the basis that the insured's affidavit stated only that he did not expect that his daughter would suffer "the type of injuries that she has

---

**7.** Criminal trial testimony that was included in this record indicates that, during one incident, the boys' parents arrived at Kowalski's home while the boys were undressed. Kowalski quickly got the boys dressed so that they would not be found out. Further, the allegations in the amended complaint are that Kowalski's behavior was secretive and duplicitous. He did not inform the boys' parents that he was a pedophile, and used his relationship with Roger Deprey, Sr., and the subsequent death of Mr. Deprey, to gain the trust of appellants, and ultimately, to act upon his sexual urges.

alleged in her complaint," as distinguished from Kowalski's claim that he did not intend or expect that his conduct would cause any injury. Our entire discussion in *Harpy*, however, focused on presumed intent as a matter of law, rather than on the sufficiency of the particular evidence supplied by the insured. Accordingly, we do not believe that this difference supplies a relevant distinction.

Appellants further seek to distinguish *Harpy* on the basis that it involved different issues of contract interpretation, given that Erie "intentionally failed to utilize a 'sexual molestation exclusion....'" As we noted earlier, Erie included a sexual molestation exclusion in one of the policies at issue, but that exclusion was not approved by the Maryland Insurance Commissioner until after the pertinent dates of coverage. The issue before us is the interpretation of the intentional injury exclusion, the exact issue that was before us in *Harpy*.

As we noted in *Harpy*, other jurisdictions that have decided the issue are almost unanimous in their exclusion of coverage for child sexual abuse under the intentional injury exclusion, regardless of whether they apply a subjective or an objective standard. *See, e.g., State Farm Fire and Cas. Co. v. Davis*, 612 So.2d 458 (Ala.1993); *CNA Ins. Co. v. McGinnis*, 282 Ark. 90, 666 S.W.2d 689 (1984); *J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal.3d 1009, 278 Cal.Rptr. 64, 804 P.2d 689, *cert. denied*, 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991); *Scudder v. Hanover Ins. Co.*, 201 Ill.App.3d 921, 147 Ill.Dec. 386, 559 N.E.2d 559 (1990); *Worcester Ins. Co. v. Fells Acres Day School*, 408 Mass. 393, 558 N.E.2d 958 (1990); *Linebaugh v. Berdish*, 144 Mich.App. 750, 376 N.W.2d 400 (1985); *Fireman's Fund Ins. Co. v. Hill*, 314 N.W.2d 834 (Minn.1982); *Illinois Farmers Ins. Co. v. Judith G.*, 379 N.W.2d 638 (Minn.App.1986); *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 581 N.Y.S.2d 142, 589 N.E.2d 365 (1992); *Rodriguez v. Williams*, 107 Wash.2d 381, 729 P.2d 627 (1986); *Grange Ins. Ass'n v. Authier*, 45 Wash.App. 383, 725 P.2d 642 (1986); *Western Nat. Assur. Co. v. Hecker*, 43 Wash.App. 816, 719 P.2d 954 (1986); *Horace Mann Ins. Co. v. Leeber*, 180 W.Va.

375, 376 S.E.2d 581 (1988); *State Farm Fire and Cas. Co. v. Estate of Jenner*, 874 F.2d 604 (9th Cir.1989)(applying California law); *Foremost Ins. Co. v. Weetman*, 726 F.Supp. 618 (W.D.Pa.1989), *aff'd*, 904 F.2d 697 (3rd Cir.1990) (predicting Pennsylvania law); *Whitt v. DeLeu*, 707 F.Supp. 1011 (W.D.Wis.1989) (predicting Wisconsin law); *Allstate Ins. Co. v. Roelfs*, 698 F.Supp. 815 (D.Alaska) (predicting Alaska law). *But see Loveridge v. Chartier*, 161 Wis.2d 150, 468 N.W.2d 146 (1991) (intentional injury exclusion did not apply where insured transmitted herpes simplex virus to seventeen year old girl during consensual sex with the girl even though, under Wisconsin law, sex between an adult and a minor aged 16 to 18 constitutes a misdemeanor).

Appellants identify four cases that they assert hold to the contrary: *State Farm Fire & Cas. Co. v. Nycum*, 943 F.2d 1100 (9th Cir.1991); *Alabama Farm Bureau Mutual Cas. Ins. Co. v. Dyer*, 454 So.2d 921 (Ala.1984); *MacKinnon v. Hanover Ins. Co.*, 124 N.H. 456, 471 A.2d 1166 (1984); *State Auto Mutual Ins. Co. v. McIntyre*, 652 F.Supp. 1177 (N.D.Ala.1987). In *Nycum*, the Ninth Circuit, applying California law, concluded that coverage was not excluded because the insurer had not met its burden of demonstrating that the insured intended to molest the child sexually. The court acknowledged that "once the insurer shows that the touching was intentional molestation, the insurer need not make any additional showing." *Dyer* did not involve sexual abuse. *MacKinnon* is a case that we declined to follow in *Harpy*, and for all of the reasons set forth above, we adhere to that assessment. Moreover, since publication of *MacKinnon*, the Supreme Court of New Hampshire seems to have retreated from its position on the issue. *See Vermont Mut. Ins. Co. v. Malcolm*, 128 N.H. 521, 517 A.2d 800, 803 (1986) (holding that there was no coverage of child sexual abuse under accidental occurrence policy). *McIntyre*, which involved application of Alabama law by a United States District Court, ultimately was not followed by the Supreme Court of Alabama. *See Davis*, 612 So.2d at 461–62.

Our holding in this case is simply that an adult insured's [8] intent to engage in sexual contact with a child embodies an intent to injure for the purpose of applying the intentional injury exclusion. Contrary to appellants' assertions, our holding does not preclude an insured from arguing incapacity in the appropriate case. The inquiry in such a case should be whether the insured possessed the capacity to form the intent to engage in sexual contact with a child.

JUDGMENT AFFIRMED; APPELLANTS TO PAY COSTS.

WENNER, Judge, dissenting.

Because I do not agree with my colleagues that, as a matter of law, James Kowalski, an acknowledged pedophile, intended to injure the Pettit children, I respectfully dissent.

### Facts

The genesis of this appeal is a complaint filed by Ms. Pettit, individually and on behalf of her children, seeking damages from James Kowalski for having molested her two minor children, Randall and Roger Duprey. In 1992, the Roman Catholic Church carried out the dying request of the children's father, Roger Duprey, and named Kowalski the children's godfather. Kowalski developed a close relationship with the Pettit children.

From 1 April 1991 until 25 May 1993, Kowalski voluntarily and gratuitously cared for and supervised the Pettit children at his homes in Hyattsville, Maryland and Winchester, Virginia. Unknown to the Pettits, Kowalski was suffering from pedophilia, a recognized mental disorder. As I understand it, a pedophile believes her/his relationship with male children is normal.

---

8. Obviously, a different result may occur if the insured is a child. *See Fire Ins. Exchange v. Diehl*, 206 Mich.App. 108, 520 N.W.2d 675 (1994) (holding that policy provided coverage to nine year old insured accused of sexual conduct with a six year old).

Consequently, Kowalski views his care, love, affection, and support of the Pettit children as a mutual and consensual expression of love, similar to that in an adult relationship. While Kowalski was aware of his pedophilia, he failed to inform the Pettits of his condition. Nevertheless, there is nothing to indicate that Kowalski either intended or expected to injure the Pettit children.[1] Rather, Kowalski loved and expressed his love for them in an affectionate and caring manner ordinarily reserved for an adult relationship. In sum, Kowalski was neither violent, nor did he threaten the Pettit children with violence.

During this period, Erie had provided Kowalski with four separate homeowner's and personal catastrophic liability insurance policies covering both his Maryland and Virginia homes.[2]

---

**1.** Kowalski's acknowledged love for the Pettit children is evidenced by his having routinely helped them with their school work, taken them on camping and field trips and to sporting events, shopping, swimming, picnics, and other outings. In addition, Kowalski purchased clothing and other necessary staples for the children, and named them in his will as beneficiaries.

**2.** The policies issued to Kowalski by Erie provide, in pertinent part:

(1) *Ultrasure Package Policy for Landlords*—covers "personal injury ... which occurs during the policy period ... [and is] caused by an occurrence which takes place in the covered territory."
*excludes*—"injury expected or intended from the standpoint of anyone we protect."

(2) *Homeprotector 2003 Extra Cover Edition*—covers "all sums which anyone we protect becomes legally obligated to pay as damages because of bodily injury ... covered by this policy."
*excludes* "bodily injury or property damage expected or intended by anyone we protect."

(3) *Homeprotector 2003 Extra Cover Edition*—covers "all sums which anyone we protect becomes legally obligated to pay as damages because of bodily injury ... covered by this policy."
*excludes*—"bodily injury or property damage expected or intended by anyone we protect."

(4) *Homeprotector 2004 Tenant Cover Edition* (effective 1 May 1993—1 May 1994)—covers "all sums ... which anyone we protect becomes legally obligated to pay as damages because of bodily injury or property damage, resulting from an occurrence during the policy period."

As I have said, Ms. Pettit filed a complaint in the Circuit Court for Prince George's County charging Kowalski with negligence, and seeking damages from Kowalski for having sexually abused the children. Kowalski then sought from Erie coverage and a defense. Erie declined to provide either, and filed a Bill for Declaratory Relief, claiming it owed Kowalski neither coverage nor a defense. By stipulation, the underlying negligence tort action was stayed pending resolution of Erie's Bill for Declaratory Relief. Subsequently, the parties filed cross-claims for summary judgment. Following a hearing, Erie's motion for summary judgment was granted on the grounds that, as a matter of law, the policies provided no coverage, and thus, Erie had no duty to provide Kowalski with coverage or a defense. Of course, Kowalski's motion for summary judgment was denied. This appeal followed.

## Standard of Review

"The standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct." *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993). Maryland Rule 2–501(e) provides:

> The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

"In opposing a motion for summary judgment, a party is entitled not only to have the facts viewed in the light most favorable to it but also to all reasonable inferences which may be drawn from these facts." *Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 678, 541 A.2d 1303 (1988) (quoting

---

*excludes*—"bodily injury or property damage expected or intended by anyone we protect;"
*excludes*—"bodily injury or property damage which arises out of the sexual molestation, corporal punishment or physical or mental abuse by anyone we protect."

*Tyler v. Vickery,* 517 F.2d 1089, 1094 (5th Cir.1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976)).

I agree with Ms. Pettit that, as she had charged Kowalski with having negligently injured her children and Erie's policies covered such claims, Erie was obligated to provide Kowalski with both coverage and a defense. Moreover, I agree with Ms. Pettit that in making such a determination the trial court should have considered the terms of the insurance policies, the claims in the underlying tort action, and any extrinsic evidence provided by the insured. It is, of course, this last element that Ms. Pettit claims the trial court should have, but failed to consider before granting Erie's motion for summary judgment.

To the contrary, Erie does not believe that the charges in Ms. Pettit's underlying negligence tort action support a claim of negligence, asserting that, although citing no authority, Kowalski's acts were, as a matter of law, intended to injure the Pettit children. Consequently, as the policies exclude coverage for "bodily injury expected or intended by anyone we protect," Erie believes potential coverage does not exist. I do not agree.

An insurer's obligation to defend its insured "... is determined by the allegations in the tort action ... [E]ven if a tort plaintiff does not allege facts that clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy." *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 347 A.2d 842 (1975) In *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 438 A.2d 282 (1981), the Court of Appeals established a two-step approach for determining whether a potentiality of coverage exists:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the

·coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

292 Md. at 193, 438 A.2d 282.

In addition, in *Aetna Casualty & Surety Co. v. Cochran*, 337 Md. 98, 108, 651 A.2d 859 (1995), the Court of Appeals said that "the insurance policy along with the allegations in the complaint are not the sole means of establishing a potentiality of coverage," noting:

> Allowing an insured the opportunity to establish a defense to tort allegations which may provide a potentiality of coverage under an insurance policy prior to the insured incurring expenses associated with maintaining a defense in that tort action is precisely what the insured bargained for under the insurance contract. Thus, permitting an insured to establish a potentiality of coverage by reference to sources **other than the policy and the complaint** addresses this policy concern.

*Id.* at 110–111, 651 A.2d 859 (emphasis added). Moreover, "even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer must still defend if there is a *potentiality* that the claim could be covered by the policy." *Brohawn*, 276 Md. at 408, 347 A.2d 842.

Accordingly, it is necessary first to ascertain the scope and limitations of the policy's coverage, and then determine whether potential coverage exists. Since Ms. Pettit's underlying negligence tort action charges that Kowalski is a pedophile, the trial court should have considered such evidence before determining whether a potentiality of coverage existed.

I point out that Ms. Pettit's underlying negligence tort action charges Kowalski with three counts of negligently injuring her children. Erie declined Kowalski's coverage and a defense, claiming the allegations in Ms. Pettit's underlying negligence tort action do not support claims of negligence. On the other hand, Erie concedes that potential coverage would

exist "if it is possible for the trier of fact to find that one of Mr. Kowalski's alleged actions was negligent."

Traditionally, negligence consists of:

(1) A duty, or obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

(2) A failure on the person's part to conform to the standard required: a breach of the duty....

(3) A reasonably close causal connection between the conduct and the resulting injury....

(4) Actual loss or damage resulting to the interests of another....

*B.N. v. K.K.,* 312 Md. 135, 141, 538 A.2d 1175 (1988). Hence, as "the presence of an intent to do an act does not preclude negligence," *Ghassemieh v. Schafer,* 52 Md.App. 31, 40, 447 A.2d 84, *cert. denied,* 294 Md. 543 (1982), I believe Ms. Pettit's underlying negligence tort action contained allegations of negligence.

The underlying negligence tort action charges that Kowalski knew, or should have known, that his being a pedophile constituted an unreasonable risk for the Pettit children, and that he had a duty to refrain from such conduct with the Pettit children. Moreover, Ms. Pettit alleged that, as a homeowner, it was Kowalski's duty to provide safe homes for the Pettit children and to protect them from injury because of a dangerous condition in his homes. As Kowalski frequently and gratuitously cared for and supervised the Pettit children in his homes, it was his duty to ensure their safety when entrusted to his care.

According to Ms. Pettit's underlying negligence tort action, Kowalski breached his duty by, (1) failing to restrain his pedophilic conduct when entrusted with the Pettit children; (2) failing to inform their parents that he was a pedophile and an unreasonable risk to the children; and (3) failing reasonably to protect the Pettit children from being injured by his pedophillic activities. The underlying tort action went on to

claim that Kowalski's breach of duty injured the Pettit children, and sought damages for those injuries.

Erie's policies provide: "We will pay all sums which anyone we protect becomes legally obligated to pay as damages because of bodily injury or property damage covered by this policy." [3] Three of Erie's policies also provide: "If anyone we protect is sued for damages because of bodily injury or property damage covered by this policy, we will provide a defense with a lawyer we choose, even if the allegations are not true."

In view of this language, and that the underlying tort action charged Kowalski with negligence, I believe Erie was obliged to provide Kowalski with coverage and a defense. According to Erie, the "intentional injury" exclusion relieves it of its duty to provide Kowalski either with coverage or with a defense. The intentional injury exclusion upon which Erie relies provides: "WHAT WE DO NOT COVER (1) Bodily injury or property damage expected or intended by anyone we protect."

Thus, in determining whether potential coverage exists, it must be determined whether Kowalski's pedophillic acts constitute "bodily injury expected or intended by anyone we protect." The trial court believed this exclusion clause excluded Ms. Pettit's claims from potential coverage. I disagree. While Erie urges that Kowalski's pedophillic acts, as a matter of law, constitute intentional injuries, I find no Maryland precedent supporting Erie's position.

No doubt relying on society's visceral reaction to pedophiles, with which I certainly agree, Erie urges us to create an exception to the long established and familiar framework of negligence. That is that, in a situation such as the one now before us, Kowalski intended to injure the Pettit children. While I agree that Kowalski's actions are not only egregious, but well beyond the moral views of our society, the long

---

**3.** The language of two of the policies vary slightly. These variations, however, are not material to the issue being considered.

established framework of negligence as it has evolved over these many years must be considered.

Maryland has long applied a subjective standard in cases involving intentional torts. That is, not only must the intent of the individual who committed the intentional act be considered, but also the intent to cause the injury suffered from the intentional act. For example, in *Allstate Ins. Co. v. Sparks*, 63 Md.App. 738, 493 A.2d 1110 (1985), we held that, although the insured's son intended to syphon gasoline from a truck parked near a mill, he did not intend to cause the fire that destroyed the mill. Consequently, we concluded that the policy's intentional injury exclusion did not apply.

In *Allstate*, in construing the language of the exclusion that "damage which is either expected or intended from the standpoint of the insured," we opined that "[f]irst, there is the question of whether the **results** or the **means** must have been intended. The Allstate policy indicates, in our view, that the insured must have intended the results ("damages"), not simply the causing act, for coverage not to apply." *Id.* at 742, 493 A.2d 1110 (emphasis in original).

As I believe the language of the exclusion clause in the policies in question is similar to that in *Allstate Ins. Co.*, I would here apply the same standard.

In *Ghassemieh*, 52 Md.App. 31, 447 A.2d 84, we distinguished between intended acts and intended harm. There, we said, "While it is true . . . that the absence of intent to harm is essential to the legal conception of negligence, . . . the presence of an intent to do an act does not preclude negligence." *Id.* at 40, 447 A.2d 84 (quoting *Adams v. Carey*, 172 Md. 173, 186, 190 A. 815 (1937)).

Consequently, in order for Erie's intentional injury exclusion to apply, I believe it must be shown that Kowalski intended to injure the Pettit children, rather than merely to express his love for them in such an unfortunate manner.

The intentional injury exclusion here at issue is similar to that which recently confronted the Court of Appeals in *Bailer*

*v. Erie Ins. Exchange,* 344 Md. 515, 687 A.2d 1375 (1997).[4] Notably, in *Bailer* Erie conceded in its brief that the intentional injury exclusion did not preclude coverage for a tort that "produces an unintended result, even if the means were intended." *Id.* at 528, 687 A.2d 1375. Not surprisingly, here Erie makes no such concession. Instead, Erie attempts to distinguish *Bailer* because the *Bailer* policy was an excess coverage policy, while that in the case at hand is a basic liability policy. As I see it, this distinction is of no avail to Erie.

The approach we adopted in *Allstate* and *Ghassemieh* is supported by 7A Appleman, INSURANCE LAW AND PRACTICE, § 4492.02 (1979):

> The rebuttable presumption that a person intends the ordinary consequences of his voluntary act that is used in determining responsibility for the consequences of a voluntary act has no application to the interpretation of terms used in insurance contracts. The word "intent" for purposes of tort law and for purposes of exclusionary clauses in insurance policies denotes that the actor desires to cause the consequences of his act or believes that consequences are substantially certain to result from it.

*Id.* at 29 (footnote omitted).

We held in *Harpy v. Nationwide Mut. Fire Ins. Co.,* 76 Md.App. 474, 545 A.2d 718 (1988), a case somewhat similar to the instant case, that, under the facts there presented, the insured was not entitled to coverage for having sexually abused his daughter. The *Harpy* facts, however, differ in three important respects from those in the case at hand.

First, the insured in *Harpy* was not a pedophile, and suffered no mental disorder precluding him from forming the

---

**4.** I find it interesting that, until being questioned at oral argument, Erie failed to acknowledge *Bailer,* even though it had been discussed in both appellant's initial and reply brief, and Erie had been a party in *Bailer.*

required intent to injure. Thus, Erie concedes that this issue was neither raised in nor addressed in *Harpy*.

Second, we emphasized in *Harpy* that Harpy had submitted an affidavit that he did not intend or expect "that [the child] would **suffer the type of injuries** that she has alleged in her complaint against me." While we pointed out that such a self-serving affidavit was of no avail to Harpy, I believe it is instructive to observe the language chosen by Harpy, that he neither intended nor expected that the child would suffer "the type of injuries that she has alleged in her complaint . . . ." rather than that he neither intended nor expected that she would suffer any injury. Here, however, Kowalski is a pedophile. While he may have intended his pedophillic acts, he may not have intended to injure the Pettit children. I believe this is a question for the fact finder.

Moreover, *Harpy* involved rape, while in the case at hand there is no evidence of violence or of rape. Although in occasionally encouraging his pedophile friends to participate, Kowalski may have intended to injure the Pettit children, I believe this is likewise a question for the fact finder.

In conclusion, I believe that in cases such as the one at hand, a pedophile's intent to injure the child involved should be submitted to the fact finder, not determined as a matter of law. I believe submitting such evidence to the fact finder, comports with the familiar and long established framework of negligence tort law. Consequently, I believe that the trial court erred in granting Erie's motion for summary judgment.