482 A.2d 9

**MARYLAND LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION**

v.

**James A. PERROTT, Receiver of American Centennial Life Insurance Company.**

No. 143, Sept. Term, 1983.

Court of Appeals of Maryland.

Oct. 4, 1984.

Edwin T. Steffy, Jr., Baltimore (Griffin, O'Ferrall & Steffy, Baltimore, on brief), for appellant.

Stanford H. Franklin, Baltimore, and John L. Taylor, Jr., Atlanta, Ga. (Rocklin, Franklin & Karlin, Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ.

RODOWSKY, Judge.

Appellant, Maryland Life and Health Insurance Guaranty Association (the Association), is a nonprofit legal entity created by the Maryland Life and Health Insurance Guaranty Association Act, Md. Code (1957, 1979 Repl.Vol., 1983 Cum.Supp.), Art. 48A, §§ 520–537 (the Md. Act). The goal of the Md. Act is to protect certain classes of persons against loss due to financial failure by a life, health, or annuity insurer. *See* § 521. Appellee, James A. Perrott (Perrott), is the receiver in liquidation of American Centennial Life Insurance Company (ACLIC), a dissolved Maryland corporation which wrote health, life, and annuity coverage. In this case the Association seeks certain financial information concerning ACLIC and the receivership. The trial court, viewing the Association as simply a creditor, denied access to the data. The Association appealed. On our own motion we issued the writ of certiorari to the Court of Special Appeals prior to its consideration of the matter in order to address the relationship of the Association under the Md. Act to the receivership proceedings. As hereinafter explained, the Association is not merely a creditor.

The particular issues presented arise out of the following facts. ACLIC was a wholly owned subsidiary of Tidewater Group, Inc. (Tidewater). On October 1, 1979, Tidewater filed a petition under Chapter 11 of the Bankruptcy Reform Act in the Bankruptcy Court for the Northern District of Georgia. About October 30, 1979, Tidewater and Providers

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but because of illness did not take part in the adoption of the opinion.

Benefit Life Insurance Company (Providers) agreed that the latter would buy all of the stock in ACLIC for "$700,000 subject to adjustment based on the deficiency in the capital and surplus account." *In re Tidewater Group, Inc.,* 13 B.R. 764, 765 (Bankr.N.D.Ga.1981), *appeal dismissed,* 22 B.R. 500 (D.C.N.D.Ga.1982), *appeal dismissed,* 734 F.2d 794 (11th Cir.1984). By November 21, 1979, Providers was suing Tidewater to recover the deposit and to be relieved by the Bankruptcy Court from its approval of the sale. Providers claimed that ACLIC's financial condition had been materially misrepresented and that purported warranties in the purchase contract had been breached. When Tidewater counterclaimed for damages for breach of the purchase contract, Providers impleaded ACLIC as a third-party defendant, and ACLIC followed with a counterclaim against Providers. *See In re Tidewater Group, Inc.,* 22 B.R. 500, 502 (D.C.N.D.Ga.1982), *appeal dismissed,* 734 F.2d 794 (11th Cir.1984). That litigation is still pending insofar as we are informed by the record or by counsel.

On November 29, 1979, the then Insurance Commissioner of Maryland, Edward J. Birrane, Jr. (Birrane), caused a complaint to be filed against ACLIC in the Eighth Judicial Circuit, pursuant to the Rehabilitation and Liquidation subtitle of the Insurance Code, Art. 48A, §§ 132 to 164A. The equity court appointed Birrane as rehabilitator per §§ 141 and 145. When a cursory financial review by the Maryland Insurance Division indicated ACLIC's deficit as of February 1980 to be approximately $1,700,000, the equity court on April 2, 1980, directed liquidation and appointed Commissioner Birrane to be receiver, as specified in § 145. During that liquidation, claims on ACLIC's policies have been paid by the Association, in accordance with the statutory scheme described below.

Life, health, and annuity insurers in Maryland must "be and remain members of the Association as a condition of their authority to transact insurance in this State." § 525(1). With respect to a domestic insurer in liquidation

such as ACLIC, § 527(3) provided in 1980 in relevant part that

the Association shall, subject to the approval of the [Insurance] Commissioner,

(a) Guarantee, assume, or reinsure, or cause to be guaranteed, assumed or reinsured, the covered policies of the impaired insurer;

(b) Assure payment of the contractual obligations of the impaired insurer; and

(c) Provide such moneys, pledges, notes, guarantees, or other means as are reasonably necessary to discharge such duties.[1]

There is a board of directors of the Association (the Board) which, under § 528, has authority to assess member insurers "for funds to meet the requirements of the Association with respect to an impaired insurer [when] necessary to implement the purposes of [the Md. Act]." § 528(3)(d). Section 158A, part of the Rehabilitation and Liquidation subtitle, makes the Association a preferred creditor in a liquidation proceeding.

In the ACLIC liquidation the court on May 20, 1980, authorized the receiver to employ a firm of certified public accountants and on February 18, 1981, directed the receiver to have those accountants audit ACLIC, with the "audit report to be filed with this Court and [made] a part of its record." Three reports have been filed as they became available. All of them have been sealed under order of court. The first report is described in the court's order as being "for the year ending March 31, 1980." Papers in the public court file describe the next two reports as audits for the years ending March 31, 1981 and 1982, respectively. In his March 3, 1982, petition for reports to be sealed, Commissioner Birrane, as receiver, referred to the litigation in the

---

1. Chapter 732 of the Acts of 1981 amended § 527(3)(a) to read "the covered policies of residents of the impaired insurer." By citing to the 1980 statute, we intimate no opinion as to the effect of the 1981 amendment in relation to ACLIC.

bankruptcy court in Georgia. He alleged "that all such audit reports will, of necessity, reflect confidential Receivership operational plans for the prosecution of said litigation, the disclosure of which, would seriously impair the Receivership's case ..." and that sealing the reports was "necessary to preserve and protect your Petitioner in it's [*sic*] tactics and trial strategy...." A court order of September 8, 1982, directing that the third report be sealed recites that "the Court is convinced that absent Protective Order, there is a strong likelihood, that confidential Receivership information concerning litigation presently being prosecuted by the Receiver will be publicly disclosed...." The petitions to seal the reports were presented *ex parte,* and the orders to seal were entered *ex parte,* in accordance with accepted and generally proper practice in receivership proceedings. *Cf.* Maryland Rule BP6, which, while inapplicable to receiverships of insurers, does not require notice of an application to employ an accountant.

At the 1982 session of the General Assembly, Art. 48A, § 133 had been amended to give the equity court authority, *inter alia,* to appoint a person other than the incumbent insurance commissioner as receiver for a defunct insurer. After Birrane had resigned as commissioner, effective September 7, 1982, the court on December 2, 1982, appointed Perrott as ACLIC's receiver.[2]

The issues giving rise to the instant appeal were generated when the Association on June 30, 1983, filed a petition in the receivership requesting certain orders. Specifically, the Association asked the Court

to grant the Association "leave to intervene as a party" in the receivership proceedings; and

to order the receiver "to make available to the Petitioner for inspection and review all of its records pertaining to the insurance policies of [ACLIC] and all of the financial records of the Receivership"; and

---

2. Perrott was a judge of the Eighth Judicial Circuit from 1965 to 1982.

to order that "all audit reports which have been filed herein ... be unsealed as to the [Association]."

The petition cited § 527(8) as the Association's authority to intervene. That subsection reads:

The Association shall have standing to appear before any court in this State with jurisdiction over an impaired insurer concerning which the Association is or may become obligated under this subtitle. Such standing shall extend to all matters germane to the powers and duties of the Association, including, but not limited to, proposals for reinsuring or guaranteeing the covered policies of the impaired insurer and the determination of the covered policies and contractual obligations.

Supporting that petition was an affidavit by the chairman of the Board. He pointed out that the Association had paid in excess of $2,300,000 to claimants under covered policies of ACLIC, exclusive of monies received by the Association in certain distributions made by the receiver, that the Association had levied one assessment of $1,300,000 and another of $750,000, and that the "Association has a statutory obligation to find a solvent insurance company to assume the existing insurance policies of [ACLIC]." The chairman said that the Association was "unable to perform [that] duty" because, despite requests for information, it did not know if the receiver had maintained reserves or had assets which could be used for reserves. The affiant represented that the Board did not even know "the amount of premiums generated by the [existing ACLIC] policies." Emphasizing that, although the Association was paying claims on the ACLIC policies, the receivership was collecting the premiums, the affidavit disclaimed knowledge of whether premiums were being set aside for reserves or were being used by the receiver for current expenses. The Association's chairman also asserted his "reasonable belief that the current activities of the receivership do not warrant" the current level of expenses for salaries and expressed as additional reason for disclosure his desire to have precise data on that subject.

When the Association's petition came on for hearing, no testimony was taken. Nor did the receiver present any facts by way of affidavit, although his unsworn answer to the petition and the argument of his counsel again claimed unsealing of the reports would prejudice the litigation in Georgia. Despite having relied on § 527(8) in its petition, the Association at the hearing orally argued that it was entitled to the requested orders because it was a priority creditor in a substantial amount. The trial court found no merit in that argument. In ruling from the bench, the chancellor observed that "[*i* ]*f* [the receiver and his counsel] are right about the litigation in Georgia, I don't want to do anything that is going to jeopardize chances of a substantial recovery ...." (Emphasis added.) The court concluded:

Balancing the interest[s] involved, I don't see the Association having any interest really, except for their priority status over any other creditor as far as seeing records.

So I will deny the request to intervene and disclosure of the records. They will remain sealed.

■ At oral argument before this Court, counsel on both sides made a number of concessions which clarify and limit the scope of the dispute and which we shall describe more particularly, *infra,* when discussing the particular items of relief requested. Concessions at oral argument are appropriately considered on decision of an appeal. *See J.I. Case Credit Corp. v. Insley,* 293 Md. 483, 486–87, 445 A.2d 689, 691–92 (1982); *Cloverfields Improvement Ass'n, Inc. v. Seabreeze Properties, Inc.,* 280 Md. 382, 373 A.2d 935, *motion for reconsideration,* 280 Md. 400, 400–05, 374 A.2d 906, 907–09 (1977).

I

Before reaching the merits, we must consider the appealability issue raised by the receiver. In the course of giving his ruling, the trial judge indicated that he would likely unseal the records within one year if the Georgia litigation were not settled by that time. This, says the receiver,

prevents the denial of the requested information from being a final order.

In *Shenk v. Maryland District Savings & Loan Co.*, 235 Md. 326, 201 A.2d 498 (1964) a free shareholder in a savings and loan association which had been placed in receivership appealed from the denial of a motion to intervene in the proceedings. That intervention had been requested solely for the "purpose of keeping the appellant informed." *Id.* at 327, 201 A.2d at 499. We analyzed the matter under former Md. R. 208, the intervention rule, and concluded that the free shareholder could not intervene as of right and that there had been no abuse in denying discretionary intervention.

■■■ Thus, under *Shenk* the Association's request to intervene to obtain information relating to the ACLIC receivership is a request for a form of intervention governed by former Rule 208, which was in effect when the court below ruled. Denial of intervention, sought either as a matter of claimed right or by permission, is an appealable final order. *See Maryland Radiological Society, Inc. v. Health Services Cost Review Comm'n*, 285 Md. 383, 388 n. 4, 402 A.2d 907, 910 n. 4 (1979); *Citizens Coordinating Comm. v. TKU Assocs.*, 276 Md. 705, 351 A.2d 133 (1976); *Hall v. Jack*, 32 Md. 253 (1870).[3] The possibility that, at a later date, the court might order to be done that which the requested intervention sought to accomplish does not make a denial of intervention any less a final order.

## II

Central to the disposition of the merits of this appeal are subsections 527(3) and (8) dealing with the duty and "stand-

---

**3.** We intimate no opinion whether or not the Association's appeal would also lie under Art. 48A, § 133(4), which in relevant part provides:

> An appeal shall lie to the Court of Special Appeals ... from every other order in delinquency proceedings having the character of a final order as to the particular portion of the proceedings embraced therein.

ing" of the Association. They are better understood against the background of the Md. Act as a whole.

The Md. Act was adopted by Ch. 715 of the Acts of 1971 and is patterned substantially on a statute (the Model Act) proposed by the National Association of Insurance Commissioners (the NAIC) on December 17, 1970. *See* NAIC Model Life and Health Insurance Guaranty Association Act, I NAIC Proc. 160–73 (1971). The NAIC and commentators have recognized that a guaranty fund against insolvency of insurers in the life and health lines should differ from a fund concerned with insolvency of casualty and property insurers. In the latter fields, coverage is generally purchased for relatively short periods of time and the emphasis of a guaranty fund is on the payment of claims arising out of specified occurrences. In the life and health fields, however, policies have a continuity of coverage; there are cash values to be considered, and there is the likelihood that because of age or poor health many insureds will not be able to substitute comparable coverage for policies issued many years before. Hence, one important objective upon the insolvency of a life or health insurer is to provide for continuing the existing policies. For those reasons § 8(3)(a) of the Model Act, which is comparable to § 527(3)(a) of the Md. Act, in part provides that the Association "shall ... [g]uarantee, assume, or reinsure, or cause to be guaranteed, assumed or reinsured the covered policies of the impaired insurer...." *See* Statement of the American Life Convention, the Health Insurance Association of America, and the Life Insurance Association of America to the NAIC Subcommittee to Study Life and Disability Insurance Insolvencies and Prepare any Necessary Legislation, IIB NAIC Proc. 1072 (1970); Memorandum of the Executive Secretary's Office of the NAIC to the NAIC Subcommittee, *id.* at 1075, 1077–78. And *see generally* Havens, *Insurance Guaranty Laws: An Update on Litigation,* 16 Forum 1183 (1981); Blaine, *State Insurance Guaranty Laws—Constitutional Challenges,* 12 Forum 808 (1977).

Another aspect of the problem faced by those drafting the Model Act was its relationship to state liquidation laws. The NAIC staff had flagged this aspect for consideration. *See* Memorandum of the Executive Secretary's Office, *supra*, IIB NAIC Proc. at 1077.

Under the Md. Act, as superimposed on the pre-existing Maryland Insurance Code subtitle on liquidation, there is a separation of the making of expenditures in the receivership proceedings from fiscal control by the guaranty fund.[4] Here, the receiver of ACLIC is collecting and to some unknown extent spending premiums produced by the existing book of business while the Association is furnishing the money with which to pay claims. This case is obviously a product of the tension caused by having the power to spend in the receiver, ultimate control over that spending power in the court, and the obligation to pay the most substantial part of the defunct insurer's obligations in the Association.

Section 8, "Powers and Duties of the Association," subsection (8) of the Model Act, the provision giving a guaranty fund "standing" to appear in any court with jurisdiction over an impaired insurer, most closely attempts to deal with that tension. Subsection 527(8) of the Md. Act is identical to subsection 8(8) of the Model Act. Comments of the NAIC to § 8(8) of the Model Act advise that the subsection's purpose is "to enable the Association to protect its interests and the best interests of the policyholders in the handling of an impairment...." I NAIC Proc. at 167 (1971).

---

4. The problem was also forcefully flagged for the NAIC by the American Life Convention, the Life Insurance Association of America, and the Health Insurance Association of America. In a December 14, 1970, joint statement to the NAIC Subcommittee on the proposed Model Act, they said in part (I NAIC Proc. 183, 185 (1971)):

> We wish to make it perfectly clear that if these funds are to be taken from solvent, well-managed companies to make up the deficiencies and inadequacies of incompetent or dishonest management, then industry must have a paramount voice in how those funds are to be used. [Italics omitted.]

A

■ Against the foregoing background we turn to the Association's first request, *i.e.*, to intervene. At argument in this Court, the Association explained that it seeks to be a party in order to receive advance notice of applications made by the receiver to the court. The Association should have been permitted to intervene as a matter of right so as to attain at least that much of party status in the receivership.

The Association's responsibility under the Md. Act to guarantee the performance of ACLIC's policy obligations is a continuing one. In the course of this receivership, there have been from time to time special distributions by the receiver to the Association when, for example, receivership assets were sold or a deposit with the insurance department of another state was turned over to the receiver. The Association has a possibility of obtaining on final distribution in the receivership a further reduction in the total outlay by its members as a result of its priority under § 158A after expenses of administration, wage claims, and taxes. Because increases in the expenses of administration would ordinarily operate to reduce the amount of reimbursement on final distribution, the Association has an incentive to oppose expenses which the Association might think are unreasonable.

Subsection 527(8) supplies the procedure through which the Association protects itself. By conferring "standing" on the Association and extending that "standing" to all matters germane to the powers and duties of the Association," the Md. Act assures that the Association will be heard. Because the economics of the relationship between receiver and Association make so much of what occurs in the receivership "germane to the powers and duties of the Association," the "standing" intended by the Model Act includes a right to advance notice of applications to the court and of other proceedings. The statutory right to be heard is not satisfied by putting on the Association the burden of continually checking the docket and then apply-

ing after the fact to have an order reconsidered. Notice which a formal party would receive is what the Association means by "intervention" in its petition, and such "intervention" is its right under § 527(8).

## B

■ The next area of what we shall euphemistically call noncooperation between the receiver and the Association has to do with the basic data of the existing book of business guaranteed by the Association. One of the § 527(3) duties of the Association is to cause the covered policies of ACLIC to be assumed. It is a way for the Association to terminate its continuing guarantee. The Association's chairman swears, and the receiver does not in any evidentiary way contradict, that the Association does not have the basic information necessary to fulfill that function. In its brief to this Court, the Association illustrates what it needs to know as being "the number of policies in force, the potential liability on each policy, the annual premium on each policy, the amount of any existing reserves, the amount needed to set up the legal reserve . . . , the claim history on each policy, etc."

Because the chancellor viewed the Association only as a creditor of the receivership, he did not directly address this request. We shall remand on this aspect under MD. R. 871 for further consideration by the chancellor in light of this opinion.[5]

## C

The remaining issue is the request that the accountants' reports be unsealed. Georgia counsel for the receiver in that state participated in the argument before this Court.

---

5. In so doing we defer to the chancellor's greater knowledge of the affairs of the Association and to the reality that it is the chancellor who is to exercise discretion. Our own review of all that the uninformative record reflects leaves us unable to guess how furnishing the Association with data concerning the existing policies can prejudice the litigation in Georgia, which involves ACLIC's business as of 1979.

He made essentially three points. First, the Association's petition also asked that it be permitted to inspect and review "all of the financial records of the Receivership." Counsel interpreted this to include matters such as damage calculations prepared by the accountants at the request of counsel for use at trial. In his rebuttal the Association's counsel disclaimed that intent and in effect limited the Association's request to an unsealing of the audit reports and to the policy data discussed in Part II–B, *supra.*

Counsel for the receiver further explained that he planned to take the position in the Georgia litigation that the financials were themselves attorney's work product and that he feared disclosure to the Association would waive that position.[6] The receiver's third point emphasized the chancellor's discretion.

Counsel for the Association argued that he has never seen audited financial statements which contained trial strategy as had been alleged in the receiver's petition to seal the accountants' reports. He noted that if the trial court were to find that one or more items in these reports might prejudice the Georgia litigation, those items could be redacted. He expressed a willingness for the reports to be delivered subject to a protective order prohibiting further dissemination.

Underlying the Association's request for the reports is its desire to learn the specifics of the expenses of operating the receivership and to see if there are assets which could be used as reserves in connection with an assumption of existing policies. The Md. Act recognizes the Association's interest and standing, but whether the records are to be unsealed is a matter of discretion in the trial court.

■ At the hearing on this matter, the chancellor observed that he would likely unseal the records if the Georgia litigation were not settled within one year from that

---

6. We intimate no opinion as to the merits of this argument under either Maryland or Georgia law.

date. In light of that comment, and in recognition of the chancellor's discretion, we shall remand on this issue without affirmance or reversal. In the event the chancellor denies the Association's request, he should clarify on the record the following puzzling aspects of this situation.

How does ACLIC have any financial interest in the Georgia litigation? The suit described to us at argument is the one in which Tidewater, as sole owner of all of the stock of ACLIC, sues for damages resulting from Providers' alleged breach of the contract to buy all of the stock of ACLIC. If Tidewater is successful, how does any recovery pass from Tidewater to the ACLIC receivership? What is the cause of action in the ACLIC counterclaim against Providers?

How will furnishing the financials to the Association harm the litigation? The Association's concern is with the possibility of reducing the administration expenses in the future and with the nature and extent of current assets. The receiver's concern is with the financial condition of ACLIC preceding the rehabilitation and liquidation proceedings. Even if the audit for the period ending March 31, 1980, is of no legitimate interest to the Association, why will the litigation be harmed if the Association is made privy to the financials for the periods ending March 31, 1981, and March 31, 1982?

What facts, if any, indicate that the Georgia litigation or negotiations may be prejudiced if disclosure of the 1981 and 1982 financials is made to the Board under a protective order? Because it is in the best interest both of the Association and of the receiver to realize the maximum amount from the Georgia litigation, it would seem that representatives of neither should be expected to prejudice a favorable result.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED IN PART AND VACATED IN PART, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY JAMES A. PER-

ROTT, AS RECEIVER OF AMERICAN CENTENNIAL
LIFE INSURANCE COMPANY.