724 A.2d 102

## LITITZ MUTUAL INSURANCE COMPANY

v.

## John Edwin BELL, Sr. et al.

No. 55, Sept. Term, 1998.

Court of Appeals of Maryland.

Feb. 16, 1999.

Michael S. DeBaugh, George L. Huber, Jr., Lord & Whip, P.A., Baltimore, for petitioner.

James J. Fitzgibbons (Thomas H. Price, III, P.A., on brief), Silver Spring, for respondent.

Argued before BELL, C.J., and RODOWSKY, CHASANOW, RAKER, WILNER, CATHELL, and THEODORE G. BLOOM (retired, specially assigned), JJ.

RODOWSKY, Judge.

This is a liability insurance coverage case that was decided in the circuit court on summary judgment. The case presents another effort by a tort plaintiff to avoid the operation of an exclusion for bodily injury that is expected or intended by the insured. Here the plaintiff's submission is that, due to a psychiatric disorder, the alleged insured had no intent to injure the plaintiff when the former struck the latter with his fist. As we explain below, this attempt to convert a battery into negligence fails on the facts and the law.

## I

In December 1991, the alleged insured, John Edwin Bell, Jr. (Bell), aged 15, was a resident patient at the Psychiatric

Institute of Montgomery County (Fairbridge). Bell had been admitted because he had a very explosive temper and needed to learn how to control it. He had previously been admitted at Johns Hopkins and Sheppard Pratt hospitals for the same problem.

During the first week of December 1991, Bell applied for a pass to spend part of the upcoming weekend with his mother. By Thursday his pass had been approved for Saturday. On Saturday, December 7, 1991, Bell's mother arrived at Fairbridge sometime between 10 a.m. and 1 p.m. They requested the weekend pass. Eloise Smith (Smith), the plaintiff in the tort action underlying this coverage case, and Cheryl Moore (Moore) were at the nurse's station where passes were kept in a notebook. The pass was in the back sleeve of the notebook rather than in the "passes" section where it should have been. This alerted Smith that "something was not exactly okay."

Smith attempted to reach her supervisor by telephone and explained to Bell's mother that she (Smith) could not approve the pass until her supervisor returned her telephone call. Approximately five to ten minutes later, Bell's mother asked to be let out of the unit. At deposition, Bell described what happened next: "When I saw my mom walk off I kicked out the front door to the unit, which is the last door in. And I went to follow my mom." A second, locked door, however, blocked his exit. Smith telephoned for help but none was then available. Meanwhile, Moore was able to talk Bell into going to an area known as the "Quiet Room."

The Quiet Room is approximately 8' to 10' × 8' to 11', with no furniture, only an exercise mat on the floor, and a single small window near the ceiling. The room connects to the main hallway by a small hallway, approximately 4' × 4'. One door (the first door) connects the main hallway to the small hallway, and another door (the second door) connects the small hallway to the Quiet Room. There is a bathroom off the main hallway across from the first door.

Bell described why he walked into the Quiet Room:

"I turned around and the staff had followed me out, a few staff members had followed me out. I walked back to the quiet room and sat down and asked for my space, which is what we were supposed to do when we became angry. If we put ourselves in, okay, I am going in here, I need my space, leave me alone for 15, 20 minutes."

Once inside, Bell took off his shoes and emptied his pockets according to the facility's rules for the Quiet Room. He testified on deposition that Smith and Moore entered the Quiet Room approximately five to ten minutes after he walked into the room (apparently in order to have Bell make a statement explaining his actions). Bell's evidence is that he told Smith and Moore that he needed "some space" but that, while Smith and Moore would initially step back, they would again approach him and repetitively ask, "what is wrong, what bothers you, calm down." Bell described his feelings at this point:

"Q. Could you feel yourself filling up with anger?

"A. I was so boiling to the point I was lobster red at the time."

Bell then struck Smith in her chest with his fist, knocking Smith backward. In his own words:

"After asking her for my space three or four times, I rose and punched her in her chest region. And I sat right back down.

. . . .

"I need my space, and when I didn't feel I was getting what I was asking for, I rose and struck her."

Bell recalls striking Smith only once.[1]

Bell says that, after hitting Smith, he sat for approximately five minutes until staff members took him into his bedroom and restrained him for approximately eight hours. While being removed from the Quiet Room Bell recalls seeing par-

---

1. Smith described being hit by Bell three times. Bell moved toward Smith with his hands clenched in fists and struck her with his fist in her

amedics tending to somebody in one of the bathrooms, and he assumed that they were tending to Smith. Bell described his thoughts at that time:

"[M]y first concern was I really screwed up here, I have hurt somebody, I want to make sure that person is okay. . . .

"Q. You were aware at the time you had struck somebody and you had hurt somebody?

"A. Yes, sir."

In his answers to interrogatories Bell stated:

"There was never any intent by me to cause injury or damage to Eloise Smith. The contact made between us was a result of a[n] unexpected attack of anger, exacerbated by the conduct of Eloise Smith. I believe that if Eloise Smith had acted in accordance with the rules of the institution, and allowed me to remain in the quiet room alone, that my anger would have subsided and the incident would never have occurred."

In March 1995 Smith filed a one count complaint in the Circuit Court for Montgomery County against Bell, alleging that Bell had "negligently struck her."

At the time of the occurrence Bell's parents and members of their household were insured against liability under a homeowner's policy issued by Lititz Mutual Insurance Company (Lititz). Under the terms of the policy, Lititz is obligated to defend and indemnify any claim or suit brought against an "insured" for "bodily injury" or "property damage" caused by an "occurrence." "Occurrence" is defined to mean "an accident, including exposure to conditions, which results, during

---

right breast and rib areas as Smith was trying to move out of Bell's way. This first blow knocked Smith backward from the second door to the first door. Smith states that Bell struck her a second time, hitting her in her hand as she attempted to protect herself, and her hand then hit her in her jaw and mouth. This second blow propelled Smith through the first door into the main hallway. Smith states that Bell struck her a third time with his fist, knocking her into the bathroom across the main hallway. Smith lost her balance and fell, her head struck a bathroom sink, and she was rendered unconscious.

the policy period, in: a. **bodily injury;** or b. **property damage.**" Personal liability coverage under the policy "do[es] not apply to **bodily injury** or **property damage** ... which is expected or intended by the **insured**[.]"

In August 1995 Lititz filed a Complaint for Declaratory Relief in the Circuit Court for Montgomery County, naming Bell, his parents, and Smith as defendants. Lititz asserted, *inter alia,* that Smith's alleged personal injuries and damages were not the result of a covered "occurrence" because they were expected or intended by Bell and, therefore, excluded from coverage. Lititz requested that the court "determine and adjudicate the rights and liabilities of the parties" and find that Lititz had no duty to defend or indemnify Bell. The declaratory judgment action was assigned to the same judge to whom the underlying tort action had been assigned.

Lititz moved for summary judgment, and Smith opposed the motion. In the opposing memorandum of facts and law counsel for Smith represented that Bell suffered from a longstanding mental condition "known as 'intermittent explosive disorder,'" which "rendered it impossible for him to form the intent necessary to deliberately cause" Smith's injury. There is no indication in the record that Bell or his parents opposed in writing Lititz's motion for summary judgment.[2]

At the hearing on Lititz's motion for summary judgment the court took special interest in Bell's mental condition and in

---

2. In a letter dated April 1992 Smith agreed to limit collection of damages stemming from the incident to any amount recovered under the Bells' insurance coverage in the underlying tort suit, in consideration for the Bells' cooperation in providing information to Smith concerning their insurance coverage. "Ms. Smith will agree to accept as her entire recovery from the third party action whatever she is able to obtain through suit or settlement with Mr. Bell's homeowner's insurance carrier (and Mrs. Bell's, if applicable), and will not pursue any action for restitution against him in the Juvenile Court or otherwise or any excess judgment against John, Jr."

At oral argument before this Court, Smith's counsel stated, with regard to the underlying tort claim, "I am only characterizing it as negligent solely for the purpose of trying to get insurance coverage." In her brief to this Court, Smith stated: "In the civil action by Ms. Smith against John E. Bell, Jr., there was no basis for any attempt to

whether Bell could be held criminally responsible. The court stated that "the reasonable layperson probably would believe that if the mental disorder was so severe as to relieve them of criminal responsibility, that it would be severe enough that it would afford them, under a reasonable interpretation of the policy, with coverage." Accordingly, the judge.declared that he was going to decide the coverage question according to the standard stated in Maryland Code (1982, 1994 Repl.Vol.), § 12–108(a) of the Health–General Article:

"A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity:

"(1) To appreciate the criminality of that conduct; or

"(2) To conform that conduct to the requirements of law."

Concluding that there was a potentiality of coverage on the theory that Bell may not have been criminally responsible, the court denied Lititz's motion for summary judgment. Then the circuit court conceptually fused its not criminally responsible theory that it had applied to the coverage case with the elements of the plaintiff's case in the tort action.

"THE COURT: So, in effect, won't they have to litigate in the underlying action that this was an unintentional act. And the only way that it could be unintentional or negligent or accidental in this context will be if they can establish to a jury's satisfaction that he comes within the definition of a person who would not be criminally responsible?

. . . .

"THE COURT: Maybe we can do this very easily because it is the plaintiff who would have the burden. . . . So if the plaintiff concedes that in the underlying action, in order to prevail, to have to be able to establish that this act

hold his parents liable. Further, personal financial exposure on the part of John, Jr. was never a viable issue because he has no assets. The 'agreement' of Ms. Smith not to go after John, Jr.'s personal assets is more illusory than real, and was made by Ms. Smith so as to facilitate her claim on the insurance policy."

which occurred—that at the time the act occurred that the defendant would have been entitled to the defense of not criminally responsible, were this a criminal action, then—

"[SMITH'S COUNSEL]: I concede that, Your Honor. If I prove that he intentionally did it, then I lose the underlying action.

"THE COURT: Well, do you concede in light of what I have ruled that it is going to be incumbent upon the plaintiff to prove, in light of the facts of this case, which but for the existence of this mental disorder, are on their face intentional?

"[SMITH'S COUNSEL]: Yes, sir."

Having determined that the question of intent would be decided in the tort action, the circuit court dismissed the declaratory judgment action.

In its final order in the declaratory judgment action, the circuit court included the following additional provision:

"In order to prevail . . . in the tort action . . . Smith must prove, pursuant to Section 12–108 of Maryland's Health–General Article that, because of a mental disorder or mental retardation, Mr. Bell, Jr., at the time of the conduct in question, lacked substantial capacity: (1) to appreciate the criminality of that conduct; or (2) to conform that conduct to the requirements of law. If Ms. Smith does not satisfy this burden of proof by a preponderance of evidence, then judgment shall be entered in favor of Mr. Bell, Jr. and against Ms. Smith in that action, on her claim for negligence." [3]

Lititz appealed to the Court of Special Appeals from the final judgment in the declaratory judgment action. That court affirmed by a divided panel in an unreported opinion.

---

**3.** With regard to this part of the circuit court's order directed toward the application of the criminal non-responsibility standard to the issues in the tort case, the Court of Special Appeals ruled that the tort action was not before that court on the appeal and, therefore, that court could not rule on the issue. We agree.

We note, however, that it is far from clear whether Bell's criminal responsibility would be an issue in the tort case. *See Cross v. Kent,* 32

The majority in the Court of Special Appeals reviewed *Brohawn v. Transamerica Insurance Co.*, 276 Md. 396, 347 A.2d 842 (1975), and *Allstate Insurance Co. v. Atwood*, 319 Md. 247, 572 A.2d 154 (1990), concluding:

"As we see it, this case does not present the precise concern that the Court discussed in *Atwood* concerning 'clearly intentional' conduct, because of [Bell's] alleged mental incapacity and his long history of mental illness. In our view, it would be a gross oversimplification of [Bell's] conduct if we were to characterize his attack upon Smith as patently deliberate. Moreover, the issue of mental incapacity was of obvious concern to the trial court in the declaratory judgment action. Indeed, the trial court observed at the summary judgment hearing that 'this is a most difficult case.' Because of the seriousness of the mental capacity issue, we are satisfied that the court was not required to infer an intent to injure as a matter of law. Rather, when the trial court entertains doubt as to whether an intent to injure should be inferred as a matter of law, we cannot quarrel with its discretionary determination to dismiss the

---

Md. 581, 582–83 (1870) (affirming a judgment against a defendant, commissioned *"de lunatico inquirendo,"* in a trespass action for setting fire to and burning a barn; "The distinction between the liability of a lunatic or insane person in civil actions for *torts* committed by him, and in criminal prosecutions, is well defined, and it has always been held, and upon sound reason, that though not punishable criminally, he is liable to a civil action for any *tort* he may commit"); *Hudnall v. Sellner*, 800 F.2d 377, 384 (4th Cir.1986) (affirming a district court judgment against a mentally deficient defendant in a defamation, loss of consortium, and malicious prosecution action; of *Cross v. Kent*, the court stated: "While . . . this case is old and its rule has been subject to some criticism in the interval, its continued authority as Maryland law remains, so far as we are advised, unquestioned. Indeed it represents the current majority rule in this country"), *cert. denied sub nom. Sellner v. Panagoulis*, 479 U.S. 1069, 107 S.Ct. 960, 93 L.Ed.2d 1008 (1987); Restatement (Second) of Torts § 895J (1979) ("One who has deficient mental capacity is not immune from tort liability solely for that reason."); *cf. id.*, § 895J cmt. c. ("The mental condition of the defendant must, however, be taken into account in determining, not whether he is liable for his torts, but whether in the particular instance any tort has been committed at all.").

declaratory judgment proceeding and allow the issue to be resolved through the underlying tort suit."

The intermediate appellate court distinguished its decision in *Pettit v. Erie Insurance Exchange*, 117 Md.App. 212, 699 A.2d 550 (1997). (When the Court of Special Appeals decided this case, this Court had granted certiorari in *Pettit* but had not yet decided the case.) The court below distinguished its own *Pettit* decision on the ground that the insured in that case had been diagnosed with pedophilia, a condition "not 'dependent upon ... any distortion in cognition or perception'" (quoting *Pettit*, 117 Md.App. at 228, 699 A.2d at 559). The court looked to the definition of intermittent explosive disorder in American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 312.34, at 609–10 (4th ed. 1994) (DSM–IV), thereby implying, by way of contrast, that Bell's mental condition could interfere with cognition or perception. The court, however, noted that "the record does not reveal whether Intermittent Explosive Disorder interferes with the formulation of intent."

Lititz petitioned this Court for a writ of certiorari which we granted. It presented two issues. Our answer to the first question, set forth below, is dispositive.

"Did the Court of Special Appeals misapply *Atwood* and err in affirming the trial court's decision to dismiss Lititz' declaratory proceeding and place the coverage issues into a forum where these issues cannot possibly be 'fairly litigated'?"

Only Lititz and Smith submitted briefs to this Court and participated in oral argument; the Bells did not do so.

## II

The general rule in Maryland is that it is inappropriate for a liability insurer to bring a declaratory judgment action to resolve an insurance coverage issue that is the same as an issue presented in a pending, underlying tort action that has not yet gone to trial. *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 406, 347 A.2d 842, 849 (1975). There are, however, circumstances under which a declaratory judgment is appro-

priate while the tort trial is pending. We recently reviewed these circumstances in *Pettit v. Erie Insurance Exchange,* 349 Md. 777, 709 A.2d 1287 (1998), where we said:

"Erie is entitled to a summary judgment declaring that it has no duty to defend Kowalski only if it is manifestly clear that in the underlying tort suit the petitioner cannot allege facts giving rise to a potentiality of coverage. *See Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 408, 347 A.2d 842, 850 (1975) ('Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy.'). Although declaratory judgment actions are disfavored in liability insurance coverage cases while the underlying tort action is pending, such relief is appropriate prior to trial of the tort action where the allegations in the underlying tort claims 'obviously constitute a patent attempt to recharacterize, as negligent, an act that is clearly intentional. . . .' *Allstate Ins. Co. v. Atwood,* 319 Md. 247, 253, 572 A.2d 154, 157 (1990); *see also Brohawn,* 276 Md. at 406, 347 A.2d at 849. Under the unique circumstances in *Atwood,* this Court permitted a post tort-trial, declaratory judgment coverage action after the jury in the tort case may well have found that a battery was negligence. We examined how, because both the plaintiff and the defendant in a tort suit share a common interest in coverage being applicable, there may be collusion and an effort to manipulate coverage. As a result, 'plaintiffs' attorneys bring suits for "negligent rape, negligent sodomy, . . . and negligent sexual molestation." ' *Atwood,* 319 Md. at 253, 572 A.2d at 156–57 (quoting Brief of Allstate Ins. Co.). Both parties to the tort action profit by a jury's ruling that ' "even the most obvious and blatant criminal and/or intentional acts [are] negligent conduct." ' *Id.* at 253, 572 A.2d at 157 (quoting Brief of Allstate Ins. Co.)."

*Id.* at 780–81, 709 A.2d at 1289.

In the underlying tort action in *Pettit* a mother alleged that the insured had negligently sexually molested her minor chil-

dren. *Id.* at 779, 709 A.2d at 1288. Prior to trial, the insurer
sought a judgment declaring that it had no duty to indemnify
or defend because of an exclusion for "injury or damage
expected or intended" by the insured. *Id.,* 709 A.2d at 1289.
This Court affirmed a summary judgment for the insurer.
The principal argument supporting coverage was based on the
affidavit of a psychiatric expert who opined that the defendant
had no subjective intent to injure the children because of his
diagnosed pedophilia, a disorder that caused the defendant to
believe that it was healthy and normal to engage in sexual
activity with children. *Id.* at 784, 709 A.2d at 1291. Although
the pedophile in *Pettit* "intended to engage in the conduct
constituting sexual acts and contacts," the tort plaintiff sub-
mitted that, because the pedophile "subjectively believed that
the sexual acts and contacts were not harmful," there was
coverage. *Id.* at 785, 709 A.2d at 1291.

Rejecting this subjective intent argument, we stated that
"sexual molestation is a tort which is only committed inten-
tionally." *Id.* at 786, 709 A.2d at 1292. We explained:

"There is no dichotomy between the 'damages' resulting
from Kowalski's conduct and his intent to perform the acts
of sexual child abuse. Unlike [*Allstate Insurance Co. v.*]
*Sparks,* [63 Md.App. 738, 493 A.2d 1110 (1985),] the harm
committed by Kowalski—sexual molestation of two young
boys—is entirely contained within the activity which he
admits; the resulting harm *is* Kowalski's conduct itself.
*See Doe* [*v. Archdiocese of Washington* ], 114 Md.App. [169,]
186, 689 A.2d [634,] 643 [ (1997) ] ('In a case of battery ...
the invasion of the victim's dignitary interest is invariably
concurrent with the actions that constitute the intentional
tort itself.'); Restatement (Second) of Torts § 19 [ (1965) ]."
*Id.*

As the Court of Special Appeals explained in its decision in
*Pettit,* "By definition, Kowalski's sexual molestation of the
boys constituted common law battery." 117 Md.App. at 224,
699 A.2d at 556. The court quoted the definition of battery
from the Restatement (Second) of Torts § 13 (1965), and

stated that "[i]f the act is done with the intention of making the offensive contact, it is immaterial that the actor is not motivated by any personal hostility or intent to injure." 117 Md.App. at 224, 699 A.2d at 557 (citing Restatement (Second) of Torts §§ 13 cmt. c, 16 cmt. b).

Also relevant is *Saba v. Darling*, 320 Md. 45, 575 A.2d 1240 (1990), *aff'g* 72 Md.App. 487, 531 A.2d 696 (1987). While intoxicated, the defendant punched the plaintiff in the face outside of a bar, inspiring an action for assault and battery and for negligence. *Id.* at 47, 575 A.2d at 1241. The plaintiff voluntarily dismissed the assault and battery claim after discovering that the defendant's insurance policy excluded coverage if bodily injury was intended by the insured. *Id.* At trial the jury found for the defendant, apparently on the ground that the plaintiff was contributorily negligent. *Id.* The plaintiff appealed, arguing that the trial judge failed to respond to a question from the jury regarding contributory negligence. The Court of Special Appeals refused to consider that issue, concluding instead that the plaintiff's injuries were the direct result of an assault and battery and that the issue of negligence never should have gone to the jury.

This Court affirmed on the following rationale:

"Despite the host of conflicting stories in the record before us, we do know that on June 16, 1984, Charles Darling intentionally hit Markus Saba causing injury to his jaw. Such an event is the *sine qua non* of an intentional tort. A battery has been defined as a harmful or offensive contact with a person resulting from an act intended to cause the person such contact. *See* Restatement (Second) of Torts, § 13. The act in question must be some positive or affirmative action on the part of the defendant. Prosser & Keeton, The Law of Torts, § 9 (5th ed.1984). The facts of the instant case as set forth above illustrate that each element of this definition has been met. Although Darling testified that he did not intend to break Saba's jaw, obviously he intended to strike Saba and the severity of the injury is of no consequence in an analysis of Darling's state of mind."

320 Md. at 49, 575 A.2d at 1242. We specifically noted that the defendant was not so intoxicated as to be unable to formulate an intent to strike the plaintiff. *Id.* at 50, 575 A.2d at 1243.

### III

Here, there is no dispute that Smith's injuries were the direct result of Bell's punching her. According to Bell's deposition testimony, he punched Smith because she continued to talk to him and would not leave him alone. Bell need only have intended to bring about the offensive contact, that is, to intend to strike Smith, in order for his conduct to be considered a battery. That much is admitted by Bell.

Smith argues, however, that Bell suffered from intermittent explosive disorder and that this condition rendered him incapable of formulating an intent to injure or harm her.

Intermittent explosive disorder is recognized by the American Psychiatric Association as an impulse-control disorder that is characterized by the criteria described below:

"The essential feature of Intermittent Explosive Disorder is the occurrence of discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property (Criterion A). The degree of aggressiveness expressed during an episode is grossly out of proportion to any provocation or precipitating psychosocial stressor (Criterion B). A diagnosis of Intermittent Explosive Disorder is made only after other mental disorders that might account for episodes of aggressive behavior have been ruled out (e.g., Antisocial Personality Disorder, Borderline Personality Disorder, a Psychotic Disorder, a Manic Episode, Conduct Disorder, or Attention Deficit/Hyperactivity Disorder) (Criterion C). The aggressive episodes are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., head trauma, Alzheimer's disease) (Criterion C). The individual may describe the aggressive episodes as 'spells' or 'attacks' in which the explosive behavior is preceded by a

sense of tension or arousal and is followed immediately by a sense of relief. Later the individual may feel upset, remorseful, regretful, or embarrassed about the aggressive behavior."

DSM–IV § 312.34, at 609–10. Other recognized impulse-control disorders include kleptomania, pyromania, pathological gambling, and trichotillomania (the last being characterized by the recurrent pulling out of one's hair for pleasure, gratification, or relief of tension, resulting in noticeable hair loss). *Id.* at 609.

Contrary to Smith's argument that Bell's mental condition rendered him unable to formulate an intent to injure Smith, if Bell was able to formulate an intent to hit Smith, this factor would be "the *sine qua non* of an intentional tort." *Saba,* 320 Md. at 49, 575 A.2d at 1242.

Indeed, Smith admits that Bell had the ability to formulate an intent to strike her. During oral argument before this Court, Smith's counsel conceded six times that Bell intended to strike Smith:

"COURT: What wasn't intentional? The striking or the injury?

"[SMITH'S COUNSEL]: The injury.

"COURT: Okay, the striking was intentional.

"[SMITH'S COUNSEL]: I believe so.

"COURT: With one's fist.

"[SMITH'S COUNSEL]: I believe so.

. . . .

"COURT: Did the act. We're not talking about whether he intended to injure or whether he intended the act to cause injury. If he did the act, it was not accidental.

"[SMITH'S COUNSEL]: The actual striking her was not accidental.

. . . .

"[SMITH'S COUNSEL]: It's characterized as negligence only because it wasn't intentional.

"COURT: Well, he intended to punch her. You acknowledge that.

"[SMITH'S COUNSEL]: Yes. Yes.

. . . .

"COURT: . . . So under your argument now he acknowledges he intended to strike her.

"[SMITH'S COUNSEL]: Yes.

. . . .

"[SMITH'S COUNSEL]: I think what I'm saying is he had the requisite mental capacity to understand that he was hitting her.

. . . .

"[SMITH'S COUNSEL]: . . . I'm saying based on his testimony it seems to me that he understood that he was hitting her."

■ Of course, "[c]oncessions at oral argument are appropriately considered on decision of an appeal." *Maryland Life & Health Ins. Guar. Ass'n v. Perrott,* 301 Md. 78, 86, 482 A.2d 9, 13 (1984). *See also J.I. Case Credit Corp. v. Insley,* 293 Md. 483, 487, 445 A.2d 689, 692 (1982) ("Where the appellee abandons a ground of support for the decision below by making an express concession in this Court, we need not, in our discretion, undertake a review of the matter conceded."); *Cloverfields Improvement Ass'n, Inc. v. Seabreeze Properties, Inc.,* 280 Md. 382, 373 A.2d 935, *motion for reconsideration denied per curiam,* 280 Md. 400, 403–04, 374 A.2d 906, 908–09 (1977) (holding as a "binding concession" a "stipulation or concession in open court on behalf of one of the parties as to a method for termination of a part of the litigation which was duly accepted by the other party, a concession intended to persuade this Court that it was unnecessary for us to address a certain portion of the contentions of the plaintiff below in this proceeding").

Smith argues that this case is distinguishable from *Pettit* because "[i]t is not a sexual molestation case," and that it is more analogous to *Allstate Insurance Co. v. Sparks,* 63 Md.

App. 738, 493 A.2d 1110 (1985). At issue in *Sparks* was whether intentional conduct exclusions applied to liability for fire damage. *Id.* at 740, 493 A.2d at 1111. Three boys, while attempting to syphon gasoline from a truck parked near a mill building, lit a cigarette lighter for better illumination and the flame ignited fumes that resulted in the mill being consumed by fire. *Id.* The insured argued that the boys intended to steal the gas but did not intend to damage the property. *Id.* The Court of Special Appeals held that the intentional conduct exclusions only applied if the boys intended the damages and not simply the causing act. *Id.* at 742, 493 A.2d at 1112.

Smith also relies on *Sheets v. Brethren Mutual Insurance Co.*, 342 Md. 634, 652, 679 A.2d 540, 548 (1996), for the similar proposition that "an act of negligence constitutes an 'accident' under a liability insurance policy when the resulting damage was 'an event that takes place without [the insured's] foresight or expectation.'"

 Smith ignores the concept that where the facts indicate a battery, the harm is the contact itself. *Pettit*, 349 Md. at 786, 709 A.2d at 1292. The acts of sexual molestation in *Pettit* were acts of battery, and the rationale of the decision is framed in the law of battery. *See id. Pettit*'s reasoning is in accord with *Sparks* and *Sheets.* If Bell had not intended the contact itself due to a mental condition, then the act might be considered an "accident" and not intentional because the contact (the harm) would have taken place without his foresight or expectation. However, where the actor intends to cause an offensive contact, the legally recognized harm, *ipso facto,* cannot be said to have taken place without his foresight or expectation.

Smith also argues that "[t]he majority of state courts that have considered the issue have held that an exclusion in a liability insurance policy for acts expected or intended by the insured does not apply if the insured lacks the mental capacity to intend the result." Several jurisdictions have adopted an "insanity" avoidance of the intentional conduct exclusion where the tortfeasor either was diagnosed with a mental disorder

that rendered him unable to intend the act, or was adjudicated criminally insane. *See Rosa v. Liberty Mutual Ins. Co.*, 243 F.Supp. 407, 409 (D.Conn.1965) (tortfeasor diagnosed with acute schizophrenia); *Globe American Cas. Co. v. Lyons*, 131 Ariz. 337, 342, 641 P.2d 251, 256 (Ariz.Ct.App.1981) (tortfeasor diagnosed with paranoid schizophrenia); *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 878, 151 Cal.Rptr. 285, 291, 587 P.2d 1098, 1104 (1978) (tortfeasor diagnosed with acute paranoia); *Mangus v. Western Cas. & Sur. Co.*, 41 Colo.App. 217, 218, 585 P.2d 304, 305 (1978) (tortfeasor adjudicated criminally insane); *Aetna Cas. & Sur. Co. v. Dichtl*, 78 Ill.App.3d 970, 978, 34 Ill.Dec. 759, 398 N.E.2d 582, 589 (1979) (tortfeasor adjudicated criminally insane); *von Dameck v. St. Paul Fire & Marine Ins. Co.*, 361 So.2d 283, 288 (La.Ct.App.) (tortfeasor diagnosed with paranoid psychosis), *cert. denied*, 362 So.2d 794, 802 (La.1978); *State Farm Fire & Cas. Co. v. Wicka*, 474 N.W.2d 324, 326 (Minn.1991) (psychiatrist testified that insured had a "deranged mental intellect which did deprive him of the capacity to govern his conduct in accordance with reason"); *Ruvolo v. American Cas. Co.*, 39 N.J. 490, 494, 189 A.2d 204, 206 (1963) (tortfeasor diagnosed with paranoid schizophrenia).

Here there is no need to analyze the above-cited cases. In the case before us it is admitted that Bell knowingly struck Smith. The touching is the harm. Under *Pettit* the exclusion for a bodily injury intended by the insured applies here.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMANDING THIS ACTION TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR THE ENTRY OF A DECLARATORY JUDGMENT CONFORMING WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, ELOISE SMITH, ONLY.**